2016 IL App (1st) 130484

FIFTH DIVISION
JUNE 17, 2016

No. 1-13-0484

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|---|---|---|
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 08 CR 18483 |
| | ) | |
| KEVIN ROBINSON, | ) | Honorable |
| | ) | Angela Munari Petrone, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE BURKE delivered the judgment of the court with opinion.[*]
Justices Gordon and Lampkin concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial, defendant Kevin Robinson was convicted of aggravated criminal sexual assault and aggravated kidnapping. He received a mandatory sentence of natural life for the aggravated sexual assault conviction. On direct appeal, defendant raises two claims of error. He argues that (1) there was insufficient evidence of "deceit or enticement" to sustain his conviction for aggravated kidnapping, and (2) he was denied a fair trial because the aggravated kidnapping jury instruction omitted an essential element and conflicted with the instruction on the lesser-included offense of kidnapping.

---

[*]This case was recently reassigned to Justice Burke.

¶ 2                                    I. BACKGROUND

¶ 3          On October 14, 2008, defendant was charged by indictment with two counts of aggravated criminal sexual assault, two counts of aggravated kidnapping, and one count each of criminal sexual assault, kidnapping, and unlawful restraint of the victim, B.H. The kidnapping and aggravated kidnapping charges alleged that defendant knowingly, by deceit or enticement, induced B.H. "to go from one place to another with intent secretly to confine her against her will." The aggravated kidnapping charge was predicated on criminal sexual assault, and the aggravated criminal sexual assault was predicated on kidnapping.

¶ 4          At trial, B.H. testified that she was 25 years old at the time of the incident and lived with her mother, R.H., in Chicago. She attended high school until the eleventh grade and took special education classes. On September 5, 2008, she went to the mall with her mother. At some point, she met a friend she had not seen in a while, Sanbonita West. West was with two people B.H. did not know, one of whom was defendant. West introduced her to defendant. He took B.H.'s cell phone and entered his number into it and asked for her number, which she gave to him because he "seemed like a nice person, and I thought because he was with my friend, he had to be *** a nice, sweet gentleman." She thought he would be "somebody maybe just to talk to or just maybe go out to the movies or something."

¶ 5          B.H. testified that later that night around midnight, defendant called her and asked if she would "like to go out to eat and to the movies." She agreed because she was "tired of being in the house looking at the four walls." Her mother indicated that she wanted to meet defendant first, so he met up with them at the bus stop at 93rd Street and Cottage Grove Avenue at approximately 12:45 a.m. B.H. testified that defendant walked back with her and her mother to

their house and they spent about 15 to 20 minutes talking. Her mother then gave B.H. permission to go out with defendant.

¶ 6    B.H. testified that she and defendant returned to the bus stop and took the bus to the Chicago Transit Authority (CTA) stop at 95th Street and State Street, and then they got on a Red Line train. She testified that at that point, the "[o]nly thing I knew about was going out to eat and to the movies." However, while they were on the train, defendant told her that he and a friend of his "were talking about buying some property and his friend wanted him to go check this property out." He did not indicate where the property was located. She testified that they exited the train at 79th Street and State Street and then got on a bus on 79th Street, exiting two or three blocks from Halsted Street. At the time, B.H. "didn't really think too much of it because I thought buying property—you know, that was a nice good idea." It was approximately 2 a.m. at that point. She testified that she was not sure if any movie theaters were still open at that time "because I hadn't been to the movies in a while, so I didn't know the hours."

¶ 7    B.H. testified that they walked approximately two blocks to the house, which was dark and boarded up. They walked around to the back of the house and entered. There were no lights on inside the house and no sign of anyone living there. She used the light from her cell phone to look around. They walked around the first floor of the house. After a few minutes, B.H. left defendant and went upstairs to the second floor to "see how it looked." B.H. then went upstairs to the attic. She testified that she decided on her own to go upstairs. B.H. testified that she wanted to go inside the house "just to look at the property and see how it looks." She wanted to be there and "[j]ust to hang out" with defendant. She wanted a friend to go out with so she would not have to be at home as much. She testified that she did not call her mother to tell her about going to the house because her mother would not have approved.

¶ 8        B.H. testified that when she was in the attic, she heard defendant coming up the stairs and decided that she "wanted to play a little trick on him; so I hid in the closet to see if he can find me." She testified that defendant called her name and she stayed quiet, but defendant found her in the closet. According to B.H., as she exited the closet, defendant "shoved [her] against the wall and he started kissing all over [her] neck." She told defendant "to stop. Don't do that. That's not me. That's not what I do." As B.H. tried to push defendant away, he pushed her to the floor and slapped her. B.H. screamed for help. B.H. testified that defendant told her "to quit hollering and screaming or else he would hit me again." She testified that she did not agree to have sex with him by jumping out of the closet and she did not continue to be "playful" with him.

¶ 9        B.H. testified that defendant turned her over onto her stomach and pulled down her pants and underwear, and then he pulled his own down. B.H. testified that defendant moved on top of her and "started to rape me." She testified that he placed his penis inside her vagina. He was not wearing a condom. B.H. testified that this went on for approximately 10 to 15 minutes. B.H. was scared and did not know what to do. B.H. testified that after he finished, he "turned me over and he told me that I needed to wipe myself, and I told him I didn't have anything. And that's when he told me, well, I would have to use my hand." She used her hands to clean the substance that was "like liquid" by her vagina. She testified that defendant stated, "that I better not say anything to nobody because he know [*sic*] where I stay."

¶ 10       B.H. testified that she put her clothes back on and "tried to just play it off because I was still scared" and they walked down the stairs and exited the house. She did not attempt to run away because she was scared and did not know if defendant had a weapon or "had somebody hiding somewhere in the neighborhood." They walked back to the bus stop and took the bus to the Red Line "El" stop, and then took the train to 95th Street and State Street. She did not ask

anyone for help because defendant knew where she lived and she "didn't know if he would try to come back to hurt me or someone in my family."

¶ 11    B.H. testified that after they exited the train, defendant offered to escort her home on the bus, but she told him "no, that's okay. I will make it there by myself." Once aboard the bus, B.H. called her mother and told her to meet her at 93rd Street and Cottage Grove Avenue. When she met her mother, she told her that defendant had raped her and her mother called 911 immediately. When the police arrived, B.H. told them about the rape. Not long after the police arrived, defendant called B.H. She "played it off and told him, yes, I made it home and everything was okay." B.H. and her mother then went to Trinity Hospital, where a rape kit examination was performed.

¶ 12    B.H. testified that defendant called her again in the early hours of the morning from the same number and he left her a message in which he stated, "if I have told anybody or anything, he knows where I stay at and he will come get me." B.H. testified that she listened to the message and let her mother hear it. The message disappeared at some point; she did not save it.

¶ 13    B.H. testified that she spoke with a female police officer on September 14, 2008, and the same officer came to her home on September 15, 2008. The officer showed her a photographic array of six young men. B.H. testified that she identified defendant's photograph as the individual who had raped her. She remembered the braids in his hair and recognized his face. She also viewed a live lineup at the police station on September 16, 2008, and identified defendant. She testified that she never agreed to have sex with defendant and she believed they were "going out to eat and to the movies."

¶ 14    R.H. testified that her daughter lived with her and had attended a special education high school, but did not graduate. R.H. testified that they went to the mall together on September 5,

2008, and they separated for a period of time. Later that night, B.H. told her that she received a phone call and B.H. prepared to leave the house. R.H. did not want B.H. to go, but she let her go because "she is grown." She met with defendant outside her house for three to four minutes; she did not go to the bus stop. R.H. believed B.H. and defendant were going "[t]o the movies and out to eat." R.H. testified that she attempted to call B.H.'s cell phone that night, "but it kept going to voicemail." R.H. next heard from B.H. at 3 or 4 a.m. when B.H. called her and told her to meet her at 93rd Street and Cottage Grove Avenue. When R.H. arrived, B.H. told her that she had been raped and R.H. called the police.

¶ 15     Chevette Denson testified that she was living with Sanbonita West in September 2008. They went to the mall on September 5, 2008. While waiting at the bus stop, West noticed defendant, who was a former classmate. They all took the bus to the mall. Denson and West ran into B.H. at the mall, whom Denson had never met. Defendant came up to them at some point and West introduced defendant to B.H. Denson observed an exchange of cell phone numbers.

¶ 16     Carla Thomas-Russell, an emergency room nurse at Trinity Hospital, treated B.H. sometime after 4 a.m. on September 6, 2008. She testified that B.H. had a flat affect like "someone who has some sort of developmental delays." B.H. "reported that she had been raped" and gave Thomas-Russell information about the assailant. Her report noted that B.H. "reported that the sex act that was committed on her was a penis to her vagina." B.H. did not indicate she had any pain or injury and no injuries were found during the general and genital examinations. The doctor observed whitish discharge in B.H.'s vagina. Thomas-Russell performed a criminal sexual assault kit examination on B.H., which included taking a blood sample and vaginal and anal swabs. Thomas-Russell sealed the kit and signed it and then placed it in a locked cabinet at the nurse's station. The kit was later turned over to the police.

¶ 17 Meredith Misker, a forensic scientist for the Illinois State Police Crime Lab, analyzed B.H.'s sexual assault kit. She tested the vaginal swabs for the presence of semen and saliva, but neither was detected. The rectal swabs tested positive for the presence of semen and defendant's DNA was found on the rectal swabs. She also testified that "drainage was possible from one orifice to another. They are very close in location."

¶ 18 Chicago police detective Jeanne Radjenovich testified that she interviewed B.H., her mother, Denson, and West on September 14 and 15, 2008. She used this information to assemble a photographic lineup and showed it to B.H., who identified defendant. Radjenovich issued an investigative alert for defendant. She also submitted the criminal sexual assault kit to the state crime lab. Defendant was arrested on September 16, 2008. She had B.H. view a live lineup that same day and B.H. again identified defendant as the person who sexually assaulted her.

¶ 19 The State presented propensity evidence. D.H. testified that on the evening of October 12, 2002, when she was 16 years old, she met defendant while on the Red Line and they spoke during the whole trip and exchanged phone numbers. Defendant called her the next day, around 11 p.m. or 12 a.m., and asked her to come to an "El" station, where he was with a friend who worked for the CTA. Initially, D.H. refused to meet with him. Defendant called her again and she heard a group of girls laughing in the background. D.H. felt reassured; defendant informed her "that they would be there." D.H.'s mother escorted her to the "El" station at 12 or 1 a.m. Defendant and D.H. were together in a sitting area near a bathroom within the station for a few hours. At some point, defendant's friend returned and defendant asked him to lock the door from the outside because "he didn't want any crack heads coming in" to use the bathroom. Defendant pulled a condom out of his wallet and D.H. started to play with it. Defendant stated that she "woke up his little friend" and he exposed his penis. D.H. told defendant "to put it up because we

wasn't going to do anything." Later on, she asked to see defendant's CD player, but he "play" wrestled her to the floor and moved on top of her. D.H. told him, "I am trusting you to do the right thing. Don't do this." Defendant pulled down her pants while D.H. kicked and screamed. She testified that defendant then penetrated her vagina with his penis. After defendant finished, his friend opened the door and asked what happened and defendant stated, "I did something bad to my friend." D.H. ran onto a train, but defendant followed her. D.H. solicited a woman for help and the train was stopped. The police were called and D.H. identified defendant.

¶ 20     In closing, the State argued that defendant committed aggravated criminal sexual assault premised on kidnapping in that, observing that B.H. was naive and mentally challenged, defendant induced her by deceit or enticement by lying to her about going to dinner and movie and then lying to her about "checking out some real estate. There was no real estate that he was checking out. He had no authority to be there. It was never a movie. There was never a meal. There certainly was no real estate deal in the works." Further, the State argued that he intended to secretly confine B.H. against her will in the abandoned house where no one would hear or see her. In addition, the State asserted that defendant committed aggravated kidnapping in that he also committed criminal sexual assault while committing the kidnapping.   The defense argued in closing that B.H. willingly went with defendant on the bus and train, willingly went inside the abandoned house, and consented to the sexual intercourse, but she later regretted her behavior and made up the rape allegations because she did not want to disappoint her mother. The jury found defendant guilty of aggravated kidnapping and aggravated criminal sexual assault.

¶ 21     Defense counsel filed a posttrial motion for a new trial and an amended motion for a new trial. Defendant also filed a *pro se* motion for a new trial, alleging ineffective assistance of counsel. The circuit court denied all the motions.

¶ 22    The circuit court sentenced defendant to statutorily mandated natural life imprisonment for the aggravated criminal sexual assault conviction based upon his prior conviction for criminal sexual assault of D.H. 720 ILCS 5/12-14(d)(2) (West 2008). The court sentenced defendant to a concurrent term of 20 years' imprisonment for the aggravated kidnapping conviction. This appeal followed.

¶ 23                                    II. ANALYSIS

¶ 24                            A. Sufficiency of the Evidence

¶ 25    In his first claim on appeal, defendant attacks the sufficiency of the evidence supporting his aggravated kidnapping conviction.

¶ 26    "[T]he State carries the burden of proving beyond a reasonable doubt each element of an offense." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009) (citing *Jackson v. Virginia*, 443 U.S. 307, 315-16 (1979)). When considering a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must view the evidence in the light most favorable to the prosecution to determine whether a rational trier of fact could have found that the essential elements of the offense were proven beyond a reasonable doubt. *People v. Collins*, 214 Ill. 2d 206, 217 (2005). This court will not retry the defendant or "substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of witnesses." *Siguenza-Brito*, 235 Ill. 2d at 224-25. It is the jury's responsibility to resolve conflicting testimony, weigh the evidence, and determine what reasonable inferences to draw there from. *Id.* at 224. "A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *Id.* at 225.

¶ 27    As is relevant to the present case, the offense of kidnapping occurs when "a person knowingly: *** By deceit or enticement induces another to go from one place to another with

intent secretly to confine him against his will." 720 ILCS 5/10-1(a)(3) (West 2008); *Siguenza-Brito*, 235 Ill. 2d at 225. Kidnapping is elevated to aggravated kidnapping when the defendant also commits another felony, such as aggravated criminal sexual assault, on the victim. *People v. Reeves*, 385 Ill. App. 3d 716, 727 (2008) (quoting 720 ILCS 5/10–2(a)(3) (West 2002)).

¶ 28    Defendant asserts the State failed to prove beyond a reasonable doubt that he used "deceit or enticement" to move B.H. or that he had the intent to secretly confine her.

¶ 29    Viewing the evidence in the light most favorable to the State, we find there was sufficient evidence for a rational jury to conclude that defendant used deceit and enticement to induce B.H. to accompany him that night. As the State argues, multiple layers of deceit and enticement by defendant were involved in this case. The evidence established that defendant asked B.H. to go out for dinner and movie, and this was B.H.'s and her mother's understanding when B.H. left with defendant that night. Considering that it was questionable whether any movies would be playing in the middle of the night and that defendant eventually took her to a secluded location and sexually assaulted her, it was reasonable for the jury to infer that defendant never actually intended to bring B.H. to "dinner and a movie" that night. Moreover, such a ruse was necessary considering that, had defendant instead proposed that he and B.H. go inspect a vacant, boarded-up house in the middle of the night, it is highly unlikely that B.H.'s mother would have allowed B.H. to accompany defendant. Thus, the evidence established beyond a reasonable doubt that defendant used the enticement and deceit of "dinner and a movie" to induce B.H. to go out with him that night.

¶ 30    Likewise, once they were on the train and away from B.H.'s mother, defendant again used deceit and enticement to induce B.H. to leave the train and go to the vacant house under the guise of inspecting some real estate he hoped to purchase. Defendant maintains that there was no

deceit because they did, in fact, inspect the house, and the State failed to prove that he was not sincere about his interest in purchasing the property. However, the jury was not required to accept defendant's explanation. *People v. Williams*, 295 Ill. App. 3d 663, 666 (1998) (victims' testimony and circumstantial evidence supported inference that the defendant intended to secretly confine the victims in his car when he offered candy and indicated that he would take them wherever they wanted to go if they got in his car; the trier of fact was free to disregard the defendant's testimony that he was merely asking for directions). The trier of fact is "entitled to disbelieve defendant's explanation of the incriminating circumstances." (Internal quotation marks omitted). *Siguenza-Brito*, 235 Ill. 2d at 229. Under the evidence presented, a reasonable jury could find that defendant used deceit and enticement to lure B.H. to a secluded location and that defendant was not actually attempting to inspect the house considering that it was the middle of the night, the house had no electricity or lights, was boarded up, and there was no indication that defendant possessed a key to the house.

¶ 31     Defendant contends that he did not promise to take B.H. to a movie but then, unexpectedly, take her to an abandoned house instead. However, the kidnapping statute does not require that the place defendant moved B.H. to with his "dinner and a movie" promise must be the vacant house. All the statute requires is that a defendant induce the victim "to go from one place to another." 720 ILCS 5/10-1(a)(3) (West 2008). It was sufficient that defendant induced the victim to move from her home to the train, or from the train to the abandoned house. The fact that B.H. agreed to the change of plans and willingly entered the vacant house does not vitiate the evidence and reasonable inferences drawn there from [the jury?] that defendant used deceit or enticement to induce B.H. to "go from one place to another with intent secretly to confine [her] against [her] will." 720 ILCS 5/10-1(a)(3) (West 2008); *Siguenza-Brito*, 235 Ill. 2d at 225.

Indeed, the fact that a victim willingly accompanies a defendant is the essence of kidnapping based on the "deceit and enticement" prong of the statute. See, *e.g.*, *People v. Reeves*, 385 Ill. App. 3d 716, 720-21, 727-28 (2008) (sufficient evidence of aggravated kidnapping where the victim accepted the defendant's offer to drive her home from school, and then he told her that they would go to the mall instead, and she agreed, but the defendant drove her to his girlfriend's house and then to his own house and parked inside the garage, where he and another individual sexually assaulted and murdered the victim).

¶ 32       We further observe that, despite his claim that B.H. willingly accompanied him to the house, defendant failed to specifically inform B.H. where the property was located or that the property was, in reality, an abandoned, boarded-up house. Given the testimony regarding B.H.'s mental abilities, it was reasonable for the jury to infer that although she agreed to the change of plans and willingly entered the house, she was naive to the danger posed by entering a vacant building in the middle of the night with a strange man, she was unaware of his intentions once inside the house, and she was enticed by the fact that he showed an interest in her.

¶ 33       In addition, viewing the evidence in the light most favorable to the State, it was reasonable for the jury to infer that defendant had the "intent to secretly confine" B.H. against her will. "Secret confinement is demonstrated by either the secrecy of the confinement or the place of the confinement. [Citation.] 'Secret' has been defined as '[c]oncealed; hidden; not made public; particularly, in law, *kept from the knowledge or notice of persons liable to be affected* by the act, transaction, deed, or other thing spoken of.' " (Emphasis in original.) *People v. George*, 326 Ill. App. 3d 1096, 1101 (2002) (quoting Black's Law Dictionary 1352 (6th ed. 1990)). The evidence supported the inference that defendant ultimately intended to induce B.H. to a secluded, unfamiliar location where no one would see or hear her when he sexually assaulted her.

¶ 34 Defendant also contends that his conviction must be reversed because he did not possess a "clearly malicious intent to deceive." This is not an element of aggravated kidnapping. 720 ILCS 5/10-1(a)(3) (West 2008); *Siguenza-Brito*, 235 Ill. 2d at 225. We should reject defendant's attempt to distinguish this case from other kidnapping cases on that basis, as they also did not require proof of a "malicious intent to deceive." See, *e.g.*, *People v. Brown*, 214 Ill. App. 3d 836, 839-41 (1991) (affirming aggravated kidnapping conviction where the defendant lured the victim to a hotel by promising to help her find a clerical job and informing her that they had to go to his office to compose the resume); *People v. Eyler*, 133 Ill. 2d 173, 195-98 (1989) (where the defendant lured the victim, a male prostitute, to his apartment with promise of payment for sexual services, but bound and murdered the victim once there, the court affirmed his aggravated kidnapping conviction, finding that confinement was established by evidence that the victim's wrists were bound).

¶ 35 Accordingly, viewed in the light most favorable to the prosecution, the evidence established beyond a reasonable doubt that defendant committed aggravated kidnapping. *Collins*, 214 Ill. 2d at 217.

¶ 36                                    B. Jury Instructions

¶ 37 As an alternative to his sufficiency claim, defendant contends that the jury was given erroneous and contradictory instructions on aggravated kidnapping and kidnapping where the aggravated kidnapping instruction was predicated on a confinement theory, but the charges in the indictment and the kidnapping instruction were predicated on an inducement theory.

¶ 38 Defendant acknowledges that he failed to properly preserve this issue for appellate review. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (to preserve an issue for review, defendant must object at trial and include the issue in a posttrial motion). "Illinois Supreme Court Rule

451(c) (eff. Apr. 8, 2013) provides that 'substantial defects' in criminal jury instructions 'are not waived by failure to make timely objections thereto if the interests of justice require.' " *People v. Downs*, 2015 IL 117934, ¶ 14. This limited exception permits correction of "grave errors" and "errors in cases so factually close that fundamental fairness requires that the jury be properly instructed." (Internal quotation marks omitted.) *Id.* (quoting *People v. Herron*, 215 Ill. 2d 167, 175 (2005)). Rule 451(c) is construed identically with the plain error doctrine. *Id.* This court may review forfeited error under the plain error doctrine if:

> " '(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *People v. Jenkins*, 2016 IL App (1st) 133656, ¶ 25 (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)).

¶ 39    The first step in our analysis is to determine whether a clear or obvious error occurred. *Jenkins*, 2016 IL App (1st) 133656, ¶ 25 (citing *Herron*, 215 Ill. 2d at 184).

¶ 40    " 'The purpose of jury instructions is to provide the jury with the correct legal principles applicable to the evidence, so that the jury may reach a correct conclusion according to the law and the evidence.' " *Jenkins*, 2016 IL App (1st) 133656, ¶ 26 (quoting *People v. Bannister*, 232 Ill. 2d 52, 81 (2008)). "In a criminal case, the trial court must instruct the jury on the elements of the offense, the burden of proof, and the presumption of innocence." *Id.* (citing *People v. Pierce*, 226 Ill. 2d 470, 475 (2007)). Jury instructions should be construed as a whole. *People v. Parker*, 223 Ill. 2d 494, 501 (2006).

¶ 41     Here, the parties agree that the instruction on aggravated kidnapping was erroneous. Defendant was charged under the inducement theory set forth in subsection (a)(3) of the kidnapping statute. 720 ILCS 5/10-1(a)(3) (West 2008). The indictment alleged that defendant committed aggravated kidnapping:

> "in that he, knowingly by deceit or enticement induced [B.H.] to go from one place to another with intent to secretly confine her against her will, and committed a felony, to wit: criminal sexual assault upon [B.H.]"

¶ 42     The appropriate corollary instruction for the inducement theory of aggravated kidnapping is set forth in Illinois Pattern Jury Instructions, Criminal, No. 8.05B (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 8.05B), which provides that the State must prove:

> "the defendant, by deceit or enticement, induced ___ to go from one place to another place; and
>
> *** That the defendant acted knowingly; and
>
> *** That when the defendant did so, he intended secretly to confine ___ against her will; and
>
> ***
>
> *** That the defendant committed criminal sexual assault upon ___." IPI Criminal 4th No. 8.05B.

¶ 43     In contrast, the instruction issued to the jury here was predicated on actual secret confinement. See 720 ILCS 5/10-1(a)(1) (West 2008). The instruction provided that the State had to prove defendant "secretly confined [B.H.] against her will; and *** That the defendant acted knowingly; and *** That the defendant committed criminal sexual assault upon [B.H.]" IPI Criminal 4th No. 8.05. This instruction did not require the jury to find that defendant "by deceit

or enticement, induced" B.H. "to go from one place to another place" while intending to secretly confine her. IPI Criminal 4th No. 8.05B. Rather, it only required the jury to find actual confinement. It was error to provide an instruction which omitted an element of the charged offense. "The failure to instruct the jury on an element of the offense was error." *Jenkins*, 2016 IL App (1st) 133656, ¶ 27 (citing *People v. Fonder*, 2013 IL App (3d) 120178, ¶ 22; *Neder v. United States*, 527 U.S. 1, 8 (1999)).

¶ 44        Having found error, this court must next determine whether it requires reversal. Defendant contends that the instructional error resulted in plain error requiring reversal under both prongs of the plain-error analysis. The State asserts that the variance between the instructions and the indictment does not require reversal because the instructions did not misstate the law, they did not cause defendant prejudice in preparing for trial or expose him to double jeopardy, the jury necessarily found him guilty of aggravated kidnapping under the correct theory in convicting him of kidnapping, and any error was harmless and not structural.

¶ 45        Given the resolution of defendant's challenge to the sufficiency of the evidence supporting his aggravated kidnapping conviction, we do not find that the evidence was so closely balanced that the error threatened to tip the scales of justice against him regardless of the seriousness of the error. *Piatkowski*, 225 Ill. 2d at 565. Therefore, we will consider the error under the second prong of plain-error analysis.

¶ 46        The State contends that second-prong plain error is reserved for only structural errors. Notably, however, that the Illinois Supreme Court has recently clarified that although its prior decisions "equated second-prong plain error with structural error, we did not restrict plain error to the [six] types of structural error that have been recognized by the [United States] Supreme Court." *People v. Clark*, 2016 IL 118845, ¶ 46. Accordingly, as this court has stated, "[w]hen an

error is made regarding jury instructions, the error constitutes plain error under the second prong where it 'creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial.' " *Id.* ¶ 77 (quoting *People v. Sargent*, 239 Ill. 2d 166, 191 (2010)). As our supreme court has observed, "[t]his standard is a difficult one to meet." *Sargent*, 239 Ill. 2d at 191.

> "The interests of justice demand that the rule of waiver be modified, in criminal cases, where necessary to ensure the fundamental fairness of the trial. [Citations.] Fundamental fairness includes, among other things, seeing to it that certain basic instructions *** are given. Instructions on the elements of the offense are among these basic instructions, and we have recognized that the trial court has responsibility for ensuring that they are given. [Citation.] The failure to correctly inform the jury of the elements of the crime charged has been held to be error so grave and fundamental that the waiver rule should not apply." *People v. Ogunsola*, 87 Ill. 2d 216, 222 (1981).

¶ 47    For example, in *Ogunsola*, the defendant's conviction was reversed where an omitted jury instruction "removed from the jury's consideration a disputed issue essential to the determination of defendant's guilt or innocence." *Id.* at 223. The defendant was charged with deceptive practices, but the jury was not instructed that it had to find the defendant intended to defraud the victim, which was an element of the offense. *Id.* As the primary issue at trial was intent to defraud, the court held that "fundamental fairness required that the jury be instructed" on this element. *Id.*

¶ 48    Moreover, "[w]here conflicting instructions are given, one of which is a correct statement of the law and the other is an incorrect statement of the law, the error is not harmless and

constitutes grave error." *People v. Ayers*, 331 Ill. App. 3d 742, 750 (2002). In *People v. Jenkins*, 69 Ill. 2d 61, 65 (1977), for example, one instruction on attempted murder failed to include the essential element that the defendant must not have been justified in using the force employed, which was at issue in the case, while another instruction given on attempted murder included this element. *Id.* The Illinois Supreme Court found the instructions were inconsistent and contradictory on an element of the offense and concluded that this amounted to a substantial defect constituting plain error. *Id.* at 66.

> "It is well established that the giving of contradictory instructions on an essential element in the case is prejudicial error, and is not cured by the fact that another instruction is correct. While it is true that an instruction may be inaccurate, and other instructions may remove this error, such cannot be so when the instructions are in direct conflict with one another, one stating the law correctly and the other erroneously. This is particularly true where the instruction defines the issues in the case or is mandatory in character." *Id.* at 66-67.

¶ 49     The *Jenkins* court held that the contradictory instructions improperly forced the jury to select the proper instruction and it was possible that the defendant was convicted under the erroneous instruction. *Id.* at 67. Although the defendant failed to object to the incorrect instruction, the court was "of the opinion that where there are two separate issue instructions, one proper and the other erroneous, each inconsistent with the other, our Rule 451(c) is applicable." *Id.*

¶ 50     Along the same lines, *People v. Ayers*, 331 Ill. App. 3d 742, 752 (2002), also involved contradictory and inconsistent issue instructions defining the elements of first and second degree murder. One instruction omitted that the State must prove the defendant was not justified in

using the force employed, and another instruction included this language. The court held that the contradictory instructions on an essential element constituted grave error requiring reversal. *Id.* Because the jury was "forced to choose between two inconsistent issues instructions," the omitted element of "without lawful justification" was not harmless error. *Id.* at 753. The court rejected the State's contention that the combination of the instructions and closing arguments cured any error. *Id*. While the instructions given were technically legally correct IPI instructions, both first and second degree murder were at issue and the defendant presented evidence of self-defense. *Id.* at 750. The jury was therefore forced to choose between two contradictory instructions relating to a central issue in the case, self-defense, and the jury could have improperly convicted on the basis of the incorrect instruction without considering self-defense. *Id.*[1]

¶ 51     The cases discussed above are on-point in resolving the present case. Here, the discrepancy is between two statutory subdivisions of the same offense, *i.e.*, aggravated kidnapping predicated on actual confinement or deceit and enticement. The aggravated kidnapping instruction based on actual confinement did not align with the charges in the indictment or the evidence and arguments the parties presented at trial. Actual confinement was not the focus of the trial. The essential issue at trial was whether B.H. willingly accompanied defendant and consented to the sexual intercourse, or whether defendant induced her to accompany him using deceit and enticement. The State asserted at trial that defendant used

---

[1]See also *People v. Grant*, 101 Ill. App. 3d 43, 48 (1981) (reversible error in failing to instruct the jury on the mental state required to be guilty of assault and criminal trespass to land as mental state was an essential element of both crimes); *People v. Ulloa*, 2015 IL App (1st) 131632, ¶¶ 23-25 (use of inapplicable instruction and misstatement of the elements of an offense affected the fundamental fairness of the trial); *People v. Jenkins*, 2016 IL App (1st) 133656, ¶ 27 (in trial for felony resisting or obstructing a police officer, failure to instruct that resisting or obstructing must be proximate cause of officer's injury constituted plain error where jury's determination depended solely on credibility assessment of defendant and officer). *Cf. People v. Jones*, 81 Ill. 2d 1, 10 (1979) (no reversible error despite erroneous instruction on mental state required for attempted murder because the intent element was not at issue and intent to kill was "blatantly evident" from the evidence at trial).

deceit and enticement to induce B.H. to go out with him that night and to accompany him to the abandoned house. Defendant argued that he had no deceptive intentions in asking her out to dinner and a movie and then to inspect the house, and that she willingly agreed to all of their activities that night.

¶ 52    The State contends that the instructions stated a "valid" offense and "adequately stated the law." Although the aggravated kidnapping instruction was a legally correct IPI instruction, it did not accurately state the law as related to the charged offense in this case. According to the Committee Notes, it was an incorrect instruction based on the charges in the indictment. See IPI Criminal 4th No. 8.04, Committee Note, at 4; IPI Criminal 4th No. 8.05B, Committee Note, at 11. As such, the jury instructions were missing an essential element of the offense charged. The jury conceivably found defendant guilty of aggravated kidnapping without making the requisite finding that he induced B.H. by deceit and enticement.

¶ 53    Notably, the jury received the appropriate "inducement" theory instruction on kidnapping which included the "deceit or enticement" language. The State argues that because the jury was properly instructed on the "deceit or enticement" theory in the kidnapping instruction, the jury necessarily found him guilty under that theory in convicting him of aggravated kidnapping. However, the record does not support this contention. The trial court instructed the jury that defendant was charged with aggravated kidnapping and "may be found not guilty of aggravated kidnapping or guilty of aggravated kidnapping or guilty of kidnapping." The court informed the jury that it would receive three verdict forms reflecting these options and it should only select one verdict form. It further instructed them that defendant was charged with kidnapping and he "may be found not guilty of kidnapping or guilty of kidnapping." The court informed the jury it would receive two verdict forms for this charge and it should select only one. Further, the court

instructed "[i]f you find that the state has proven the defendant guilty of both aggravated kidnapping and kidnapping, then you should select the verdict form finding the defendant guilty of aggravated kidnapping and sign it as I have stated. *** Do not sign the verdict form finding the defendant guilty of kidnapping." Accordingly, the jury was given the impression that it could find defendant guilty of aggravated kidnapping under the actual confinement theory regardless of whether it concluded that he was guilty of kidnapping under the deceit and enticement theory.

¶ 54    We note that defendant asserts that a note sent by the jury during deliberations evidenced its confusion over the conflicting instructions. The jury note inquired, "Difference aggravated or not? Explain what constitutes aggravated." The note did not specify whether it was referring to aggravated criminal sexual assault or aggravated kidnapping. We can only speculate as to which charge the jury was referring. Nevertheless, it suggests the possibility that the jury was confused regarding the difference between aggravated kidnapping and kidnapping. Moreover, the trial court's response—that it would provide the written instructions—would have only exacerbated the jury's confusion because, as noted, they contained the wrong instruction for aggravated kidnapping. As a result, the court's error rose to the level of plain error.

¶ 55    Accordingly, we reverse defendant's conviction for aggravated kidnapping. His conviction for aggravated sexual assault predicated upon kidnapping is affirmed. As noted, the jury was correctly instructed on kidnapping. The erroneous instruction on aggravated kidnapping did not impact the aggravated sexual assault offense.

¶ 56                          III. CONCLUSION

¶ 57    For the reasons stated, we affirm defendant's conviction of aggravated criminal sexual assault, reverse his conviction for aggravated kidnapping, and remand for resentencing.

¶ 58    Affirmed in part and reversed in part. Cause remanded for resentencing.