2020 IL App (1st) 171145

FIRST DISTRICT
FOURTH DIVISION
August 27, 2020

No. 1-17-1145

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14 CR 1867 |
| DWAYNE TOWNS, | ) ) | |
| | ) | |
| Defendant-Appellant. | ) ) ) ) | Honorable William G. Lacy, Judge Presiding. |

JUSTICE REYES delivered the judgment of the court, with opinion.
Presiding Justice Gordon and Justice Burke concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant, Dwayne Towns, was indicted on three counts of aggravated criminal sexual assault, three counts of aggravated kidnapping, and one count of attempted armed robbery, based on offenses he allegedly committed. Defendant was convicted of two counts of aggravated criminal sexual assault and two counts of aggravated kidnapping. Defendant was then sentenced to 30 years' imprisonment for aggravated criminal sexual assault and 30 years' imprisonment for aggravated kidnapping. Both sentences were to be served consecutively for an aggregate 60-year

sentence.

¶ 2    On appeal, defendant argues that the State failed to prove beyond a reasonable doubt that he committed aggravated kidnapping. Further, defendant argues his sentence was a *de facto* life sentence and asserts that the trial court failed to consider his employment history, education, psychiatric disorder, age, cost of incarceration, and community support in mitigation. For the following reasons, we affirm.

¶ 3                                            BACKGROUND

¶ 4    The State alleged that defendant, 48 years old, entered a vehicle in which T.M. was sleeping, drove her to a vacant lot, pointed his firearm at her, and sexually assaulted her. Defendant was indicted on three counts of aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(4), (a)(8) (West 2010)), three counts of aggravated kidnapping (*id.* § 10-2(a)(3), (a)(6)), and one count of attempted armed robbery (*id.* §§ 8-4(a), 18-2(a)(2)). The State proceeded to trial on two counts of aggravated criminal sexual assault and two counts of aggravated kidnapping.

¶ 5    At trial, T.M. testified as follows. Around 4:15 a.m. on September 4, 2011, T.M. and T.M.'s cousin, Shaneka, left a night club and went to a restaurant. Shaneka drove, and T.M. sat in the passenger's seat. When they arrived, Shaneka left to place their food order while T.M. stayed in the vehicle. As Shaneka was waiting, T.M. fell asleep with her head resting on the center console and facing the passenger window. The vehicle then started to move. T.M. woke up for a moment, but she assumed Shaneka was driving her home, so she fell back asleep. After the vehicle was parked, T.M. woke up again, and "the first thing I see when I'm waking up is a silver gun in my face," T.M. testified. When she woke up and observed defendant's firearm, T.M. testified, the vehicle "was parked—it was being put in the park motion." Later, T.M. would

similarly testify that, when she was observing defendant's firearm, the vehicle "had already been stopped at this point. What woke me was the parking motion."

¶ 6    In court, T.M. identified defendant as the individual who pointed the firearm at her. Prior to this incident she had never seen defendant before. When defendant aimed his firearm at her, he said, "If you make me happy, I'll let you go" and "you know what I want." Defendant then left the driver's seat, walked to the passenger's side, and opened the door. Defendant, with the firearm still in his hand, demanded oral sex. T.M. was afraid that defendant might shoot her if she did not cooperate. T.M. did not know where she was but thought she was in a desolate area since she could not see any houses or people outside her window. T.M. performed oral sex on defendant, and he ejaculated on her and her clothing.

¶ 7    Defendant began pulling down T.M.'s pants. T.M. begged him to stop. Defendant stopped but then demanded money, forcing T.M. to search the vehicle. T.M. could not find any money, so defendant searched the driver's side of the vehicle. Immediately upon defendant lowering his head to conduct the search, T.M. ran away. She ran barefoot for approximately a half-mile through an area that contained abandoned vehicles, shrubs, railroad tracks, and broken glass.

¶ 8    T.M. eventually reached a residential area, and with her cell phone, she called the police. Within minutes, the police arrived and transported her to the hospital. T.M. was treated for cuts and bruises. Her mouth, hands, face, and neck were swabbed for evidence. T.M. testified that the entire evening was a traumatic experience.

¶ 9    Shaneka testified that early in the morning on September 4, 2011, she drove herself and T.M. to a restaurant. T.M. stayed in the vehicle while Shaneka left to place their food order. When Shaneka returned, T.M. and the vehicle were missing. Shaneka called T.M.'s cell phone,

but she did not answer. Shaneka then proceeded to call T.M.'s house, but there was no response. Shaneka then flagged down a police vehicle. As Shaneka spoke with the police, T.M. called Shaneka's cellphone, telling her "I'm running." T.M. provided Shaneka with her location, and Shaneka rode with the police to search for T.M. Shaneka and the police eventually found T.M. crying and hyperventilating. Her legs had been cut and scraped. T.M. led Shaneka and the police to Shaneka's vehicle, which was in an area that Shaneka described as fenced-in, wooded, and containing no buildings but only grass, junk, scraps, and trees. Shaneka testified that her possessions in the vehicle had been moved around. Shaneka further testified that she did not know the defendant, nor had she given him permission to enter or drive her vehicle.

¶ 10    Christine Weathers, an expert in the field of forensic biology, testified that she was the forensic scientist who analyzed the swabs taken from T.M. Weathers found semen on the swabs taken from T.M.'s mouth and hands as well as saliva on the swab taken from T.M.'s face. Weathers preserved the swabs for DNA analysis.

¶ 11    Dana Warren, an expert in the field of forensic DNA analysis, testified that she was the forensic scientist who analyzed the swabs taken from T.M. Warren found DNA on the swab of T.M.'s hands and testified that, "in the absence of an identical twin," the DNA had come from defendant.

¶ 12    Karen Abbinanti, an expert in the field of forensic DNA analysis, testified that she was a forensic DNA analyst who analyzed the swabs taken from T.M. Abbinanti found that the sperm taken from T.M.'s oral swab matched defendant's profile.

¶ 13    Janice Govern testified that she was a detective for the Chicago Police Department. She was assigned to investigate the kidnapping and sexual assault of T.M. On December 30, 2013, Detective Govern was notified that a DNA analysis had implicated defendant. On the same day,

Detective Govern went to defendant's residence and escorted him to the police station. There, she placed him in a lineup, and from that lineup, T.M. identified defendant as the individual who kidnapped and sexually assaulted her.

¶ 14     The State rested. Defendant moved for a directed verdict, and the motion was denied. Defendant did not present any evidence and rested.

¶ 15     Following closing argument and jury instructions, the jury deliberated and found defendant guilty on all counts. Defendant filed a posttrial motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. The trial court denied the motion and proceeded to the sentencing hearing.

¶ 16     The trial court ordered a presentence investigation report (PSI) for defendant. The PSI indicates defendant's employment history. From 1980 to 1983, defendant worked at a gas company. From 1990 to 1993, defendant worked at a toy store. Finally, from 1993 to 2013, defendant worked as a self-employed contractor. The PSI indicates defendant's education, explaining that he obtained his general equivalency diploma (GED). It further indicates that he completed some college courses, but he did not receive a degree. The PSI also contains defendant's entire mental health history. At age 25, defendant was diagnosed with manic depression and bipolar disorder and had been taking psychotropic medication. Lastly, the PSI indicates defendant was 48 years old at the time of the incident.

¶ 17     At sentencing, defendant requested the minimum possible sentence. Defense counsel presented as mitigating evidence a petition signed by 52 residents from his community. The petitioners stated that defendant had lived in their community for 10 years and had helped residents carry their groceries, clean their gutters, and mow their lawns. The petitioners also emphasized that defendant's incarceration left a void in their community. In further support of a

minimum sentence, defense counsel highlighted defendant's work history. Defense counsel also stated that defendant earned his GED and earned college credit during his time spent in the Illinois Department of Corrections (IDOC). In aggravation, the State emphasized T.M.'s emotional testimony. The State also observed that defendant had been sentenced to the IDOC on four separate occasions: he had been sentenced to 1 year for possession of a controlled substance; 8 years for vehicular invasion; 5 years for aggravated robbery; and 54 months for armed violence, home invasion, and armed robbery.

¶ 18     The trial court stated that it read and reviewed the PSI prepared by the probation department. The trial court further stated that it considered counsel's arguments, defendant's petition, and the statutory factors in aggravation and mitigation. The trial court merged both counts of aggravated kidnapping and merged both counts of aggravated criminal sexual assault. Defendant was sentenced to 30 years' imprisonment for aggravated kidnapping committed while armed with a firearm and 30 years' imprisonment for aggravated criminal sexual assault while armed with a firearm. These sentences were to be served consecutively, for a total of 60 years. Defendant filed a motion to reconsider his sentence, which the trial court denied. This appeal followed.

¶ 19                                                ANALYSIS

¶ 20     On appeal, defendant argues his aggravated kidnapping conviction should be reversed because the State failed to prove all of the statutory elements beyond a reasonable doubt. In addition, defendant argues his sentence is excessive because the trial court failed to consider his employment history, education, psychiatric disorder, age, cost of incarceration, and community support. We will address each argument in turn.

¶ 21                                       Sufficiency of the Evidence

¶ 22    Defendant argues that the State failed to prove all the statutory elements of aggravated kidnapping beyond a reasonable doubt.

¶ 23    Reviewing courts resolve a sufficiency of the evidence challenge by determining whether, after considering the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Collins*, 214 Ill. 2d 206, 217 (2005) (citing *People v. Cox*, 195 Ill. 2d 378, 387 (2001)). It is the responsibility of the fact finder, not the reviewing court, to determine the credibility of the witnesses, resolve any conflicts presented by the evidence, and draw reasonable inferences from the evidence. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009) (citing *People v. Sutherland*, 155 Ill. 2d 1, 17 (1992)). A trial court's judgment can only be set aside when the proof is so unsatisfactory, improbable, or implausible that it justifies a reasonable doubt as to defendant's guilt. *People v. Slim*, 127 Ill. 2d 302, 307 (1989) (citing *People v. Johnson*, 114 Ill. 2d 170, 190 (1986)).

¶ 24    Section 10-1 of the Criminal Code of 1961 (Criminal Code) sets forth the elements to be considered. The Criminal Code defines kidnapping as follows:

"(a) A person commits the offense of kidnapping when he or she knowingly:

(1) and secretly confines another against his or her will;

(2) by force or threat of imminent force carries another from one place to another with intent secretly to confine that other person against his or her will; or

(3) by deceit or enticement induces another to go from one place to another with intent secretly to confine that other person against his or her will."

720 ILCS 5/10-1(a) (West 2010).

A defendant thus commits kidnapping by confinement, asportation, or inducement. *People v.*

*Siguenza-Brito*, 235 Ill. 2d 213, 225 (2009). Here, the State prosecuted defendant under section 10-1(a)(2), or under an asportation theory; in all of defendant's aggravated kidnapping counts, the State alleged that defendant "by force or threat of imminent force carried T.M. from one place to another with intent secretly to confine T.M. against her will."

¶ 25    Defendant argues that the State failed to prove that defendant, "by force or threat of imminent force," carried T.M. from one place to another. 720 ILCS 5/10-1(a)(2) (West 2010). According to defendant, the State's evidence demonstrated that before and during T.M.'s asportation, she was asleep and unaware that defendant was carrying a weapon. It was not until after the asportation was complete that defendant used force or threat of imminent force; that is, it was not until after the vehicle was parked that T.M. woke up and became aware of defendant's firearm. Accordingly, defendant argues, T.M.'s asportation was not forceful.

¶ 26    We must therefore resolve the following question: whether defendant, by entering Shaneka's vehicle without permission and driving a sleeping T.M. from a restaurant to a vacant lot while armed with a firearm, carried T.M. from one place to another "by force or threat of imminent force" in violation of the statute.

¶ 27    First, we find that, after considering the evidence in a light most favorable to the State, the jury could have rationally found that defendant used a threat of imminent force during T.M.'s asportation. See *Collins*, 214 Ill. 2d at 217. The parties agree that, when T.M. observed defendant brandishing his firearm, he communicated a threat of imminent force to T.M. But the parties disagree as to whether T.M. observed his firearm during her asportation. The State argues she did; defendant argues she did not. According to T.M.'s testimony, when she observed defendant's firearm, the vehicle "was parked—it was being put in the park motion." She also testified that, when she was observing defendant's firearm, the vehicle "had already been

stopped at this point" and "[w]hat woke me was the parking motion."

¶ 28    Viewing this testimony in a light most favorable to the State, a jury could have rationally concluded that when T.M. testified that "it was being put in the park motion" and "[w]hat woke me was the parking motion," she was clarifying that she observed defendant's firearm as he was parking the vehicle, or as they were moving. See *id.* The jury thus could have rationally found beyond a reasonable doubt that defendant threatened T.M. with his firearm during her asportation. See *id.* We emphasize, moreover, that determining T.M.'s credibility, resolving any conflicts in T.M.'s testimony, and drawing reasonable inferences from that testimony are the responsibility of the trial court, not the reviewing court. See *Jackson*, 232 Ill. 2d at 280-81. We further emphasize the evidence was not so unsatisfactory, improbable, or implausible that it justified a reasonable doubt as to defendant's guilt. See *Slim*, 127 Ill. 2d at 307; see also *People v. Johnson,* 2015 IL App (1st) 123249, ¶ 28 (finding that the brevity or limited distance of an asportation was not dispositive).

¶ 29    Additionally, the jury could have rationally found that defendant used force or threat of imminent force during her asportation. This conclusion requires that we construe section 10-1(a)(2) of the Criminal Code to ascertain the meaning of the word "force." The construction of a statute involves a question of law; therefore, our standard of review is *de novo*. *People v. Harris*, 203 Ill. 2d 111, 116 (2003) (citing *People v. Robinson*, 172 Ill. 2d 452, 457 (1996)).

¶ 30    When construing a statute, our primary objective is to ascertain and give effect to the legislature's intent. *People v. Perry*, 224 Ill. 2d 312, 323 (2007). The best indication of the legislature's intent is the statutory language, given its plain and ordinary meaning. *In re Ryan B.*, 212 Ill. 2d 226, 232 (2004). Furthermore, when the legislature enacts a statute, we must presume it acted with the knowledge of prevailing case law. *People v. Hickman*, 163 Ill. 2d 250, 262

(1994). We may not construe a statute in derogation of the common law beyond what the words of the statute express or beyond what is necessarily implied from what is expressed. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 69 (2004).

¶ 31     The Criminal Code does not provide a general definition of "force." See 720 ILCS 5/2-0.5 to 2-22 (West 2010). Nor does the section that defines "kidnapping" contain a definition of "force." See *id.* § 10-1. We therefore refer to prevailing case law to determine the meaning of the word "force."

¶ 32     We first note that Illinois courts have long held that a forcible kidnapping may include more than physical acts of violence. *Moody v. People*, 20 Ill. 315, 318 (1858). According to the Illinois Supreme Court, acts that constitute "force" could be "threats, fraud or other unlawful or undue influence, amounting substantially to a coercion of the will, so that, if such means had not been resorted to or employed, it would have required force to effect the removal." *Id.* As observed by our supreme court, an act could constitute "force" if it "subjects the will of the person abducted, and places such person as fully under the control of the other, as if actual force were employed." *Id.* As support, the court compared its construction with a British court's construction of the term "forcible" in a statute defining rape; in the British case, the court construed a statute that defined rape as a "forcible" act and found that sexual intercourse with a drugged and unconscious woman was "forcible." See *id.* The supreme court then asserted that its own construction and the British court's construction were indistinguishable. See *id.* Therefore, according to the court, "force" may include acts that are "a coercion of the will" or that place an individual—even an unconscious individual—under the complete control of an offender. See *id.*

¶ 33     Illinois courts have also found that a victim need not be aware that they are being kidnapped during an asportation. See *People v. Enoch*, 122 Ill. 2d 176, 195 (1988); *People v.*

*Robinson*, 2016 IL App (1st) 130484, ¶¶ 31-32. In *Enoch*, the victim worked at a hospital, and two witnesses testified that they observed the victim and the defendant walking from the hospital back to the victim's apartment after she had finished her shift. *Enoch*, 122 Ill. 2d at 181. Several hours later, the victim was found deceased in her apartment with multiple stab wounds and her hands bound behind her back. *Id.* at 182. The defendant was then charged and convicted of aggravated kidnapping. *Id.* at 185. On appeal, the defendant argued that the State failed to prove that he secretly confined the victim beyond a reasonable doubt because the evidence demonstrated that the victim voluntarily went with the defendant back to her apartment and he did not have to conceal her location from anyone. *Id.* at 195. The court disagreed, finding that the defendant kidnapped the victim despite that she accompanied him voluntarily. See *id.* The court concluded that "[t]he victim was secretly confined as effectively in her own home as if defendant had transported her to some remote isolated place of confinement." *Id.* (citing *People v. Mulcahey*, 72 Ill. 2d 282, 285 (1978)).

¶ 34    Similarly, in *Robinson*, 2016 IL App (1st) 130484, ¶ 5, the victim testified that one night the defendant told her they were going to get dinner and watch a movie. But during the victim's asportation, the defendant suggested they instead go to a property that he was considering buying. *Id.* ¶ 6. The defendant then led the victim to a boarded-up house in which no one appeared to live, and the victim testified that defendant raped her there. *Id.* ¶¶ 7-9. The defendant was charged and convicted of aggravated kidnapping—that the defendant knowingly, by deceit or enticement, induced the victim to go from one place to another with intent secretly to confine her against her will. *Id.* ¶ 3. On appeal, the defendant argued that he did not use "deceit or enticement" to induce the victim to go to the house, but we rejected his argument, finding that the defendant used "deceit or enticement" even though the victim willingly accompanied the

defendant during the asportation and before she was confined against her will. *Id.* ¶ 31.

¶ 35    Finally, in *People v. Gonzalez*, 239 Ill. 2d 471, 474-75 (2011), the defendant had left a hospital with a couple's child and was soon after arrested at another hospital two blocks away. The defendant was convicted of aggravated kidnapping; specifically, the defendant was convicted of knowingly and secretly confining a child under the age of 13 against her will. *Id.* at 473. The defendant argued on appeal that she did not secretly confine the child because she was "in constant public view or awareness." *Id.* at 478. The court disagreed, concluding that it long ago rejected the argument that a victim visible in a public place may never be found to have been secretly confined. *Id.* at 481-82 (citing *People v. Bishop*, 1 Ill. 2d 60 (1953)). "Simply put," the court asserted, "the kidnapper may choose to hide the victim in plain sight." *Id.* at 482.

¶ 36    With the above case law in mind, we conclude that the jury could have rationally found that defendant carried T.M. "by force" beyond a reasonable doubt.

¶ 37    The record establishes that defendant, without permission, entered Shaneka's vehicle with T.M. sleeping in the passenger's seat, drove T.M. from the restaurant to a vacant lot, and pointed his firearm at T.M. when she woke up. During T.M.'s asportation, she was unconscious. As defendant drove T.M. to the vacant lot, he had placed her under his complete control and carried her against her will. See *Moody*, 20 Ill. at 318. It was as if he were using physical force against T.M.—had he not driven her while she was unconscious, defendant would have needed to use physical force to move her. See *id.* That defendant would have needed to use physical force is demonstrated by evidence that defendant pointed his firearm at T.M. as she woke up and said, "If you make me happy, I'll let you go." It is further demonstrated by T.M.'s testimony that she did not know defendant or recognize where she was. Finally, it is demonstrated by evidence that, after the experience, the police found T.M. crying and hyperventilating and that T.M.

described the night as traumatic.

¶ 38   Contrary to defendant's argument, T.M. need not have been aware that defendant was carrying a firearm. See *Enoch*, 122 Ill. 2d at 195; *Robinson*, 2016 IL App (1st) 130484, ¶¶ 31-32. Moreover, she need not have been aware that "force" was being used against her or, as was the case for the victims in *Enoch* and *Robinson*, that she was even being kidnapped in the first place. See *Enoch*, 122 Ill. 2d at 195; *Robinson*, 2016 IL App (1st) 130484, ¶¶ 31-32. Further, that T.M. was unconscious during her asportation is irrelevant. See *Moody*, 20 Ill. 2d at 318; *Enoch*, 122 Ill. 2d at 195. Finally, that defendant carried T.M. in public and in plain sight is irrelevant to the question of whether he kidnapped her. See *Gonzalez*, 239 Ill. 2d at 481-82. Defendant nevertheless forcibly kidnapped T.M. despite being "in constant view or awareness." See *id.* Defendant, therefore, carried T.M. from one place to another "by force."

¶ 39   In support of his argument, defendant cites *People v. Ware*, 11 Ill. App. 3d 697 (1973). In that case, the victims had offered the defendants a ride back to their apartment, and as the victims approached the defendants' apartment, one of the defendants pointed a firearm at the victims and demanded they enter the apartment. *Id.* at 699. After that initial threat, the defendants did not threaten the victims with the firearm again. *Id.* The defendants were convicted of aggravated kidnapping, which required the State to prove that the victims did not consent to their confinement. *Id.* at 701. On appeal, the defendants argued that the State failed to prove lack of consent, asserting that the defendants did not use force to confine the victims in the apartment since they were unaware of the firearm after the defendant's initial threat. *Id.* The reviewing court in *Ware* disagreed, finding that "the mere knowledge that the gun was present in the apartment coupled with the early display of willingness to use it by [the defendant] was sufficient to instill fear in the two victims." *Id.*

¶ 40    Citing *Ware*, defendant emphasizes that he could not have carried T.M. "by force or threat of imminent force" because it was not until after he parked the vehicle that T.M. knew that defendant had a firearm. By the time T.M. became aware of the firearm, the asportation was complete. According to defendant, T.M. becoming aware of the firearm before or during the asportation is the only way defendant could have "by force or threat of imminent force" carried T.M. from one place to another. But *Ware* does not support defendant's contention. That case found knowledge of defendant's firearm and the initial threat were sufficient to constitute "force"; it does not stand for the proposition that a victim *must* be aware of a firearm or that a victim *must* be aware that force is being used against her. See *id.* As the reviewing court's determination was highly fact-specific, *Ware* does not preclude our construction of the word "force" in this case. See *id.* Defendant had already used "force" when he drove an unconscious T.M. from the restaurant to the vacant lot, placing her under his complete control and carrying her against her will. See *Moody*, 20 Ill. at 318.

¶ 41    Thus, reviewing the evidence in the light most favorable to the State, we conclude the jury rationally could have found beyond a reasonable doubt that defendant "by force or threat of imminent force" carried T.M. from one place to another.

¶ 42                                Excessive Sentence

¶ 43    Defendant also argues his sentence is excessive, first asserting that he was given a *de facto* life sentence.

¶ 44    "It is well settled that a trial judge's sentencing decisions are entitled to great deference and will not be altered on appeal absent an abuse of discretion." *People v. Jackson*, 375 Ill. App. 3d 796, 800 (2007); *People v. Snyder*, 2011 IL 111382, ¶ 36. A trial court abuses its discretion when its ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the

view adopted by the trial court. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). An abuse of discretion standard is highly deferential to the circuit court. *Davis v. Kraff*, 405 Ill. App. 3d 20, 28 (2010). "A sentence which falls within the statutory range is not an abuse of discretion unless it is manifestly disproportionate to the nature of the offense." *Jackson*, 375 Ill. App. 3d at 800.

¶ 45    Here, defendant was sentenced to 30 years for aggravated criminal sexual assault committed while armed with a firearm and 30 years for aggravated kidnapping while armed with a firearm. Aggravated criminal sexual assault is a Class X felony, carrying a sentence of 6 to 30 years. 720 ILCS 5/11-1.30(d)(1) (West 2010); 730 ILCS 5/5-4.5-25(a) (West 2010). Aggravated criminal sexual assault committed while armed with a firearm mandates that another 15 years be added to the sentence. 720 ILCS 5/11-1.30(d)(1) (West 2010). In addition, aggravated kidnapping is a Class X felony, carrying a sentence of 6 to 30 years. *Id.* § 10-2(b); 730 ILCS 5/5-4.5-25(a) (West 2010). Aggravated kidnapping committed while armed with a firearm also mandates that another 15 years be added to the sentence. 720 ILCS 5/10-2(b) (West 2010).

¶ 46    Defendant could have received a minimum sentence of 42 years or a maximum sentence of 90 years. Defendant was sentenced to 60 years, which falls within the statutory range. See *Jackson*, 375 Ill. App. 3d at 800. Furthermore, this court has recognized that, so long as a defendant's lengthy prison sentence is not otherwise an abuse of discretion, it will not be found improper merely because it arguably amounts to a *de facto* life sentence. *People v. Martin*, 2012 IL App (1st) 093506, ¶ 50. Thus, while the trial court arguably sentenced defendant, who was 54 at the time, to a *de facto* life sentence, defendant's 60-year sentence was still within the statutory range. See *id.*

¶ 47    Defendant next argues that the trial court failed to consider his employment history, education, psychiatric disorder, age, cost of incarceration, and community support.

¶ 48    All sentences must reflect the seriousness of the offense committed and the objective of rehabilitating offenders to useful citizenship. *People v. Williams*, 2017 IL App (1st) 150795, ¶ 44. The trial court must consider all factors in mitigation and aggravation. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). The seriousness of the crime, however, is the most important factor to consider. *People v. Willis*, 2013 IL App (1st) 110233, ¶ 123. Furthermore, when considering a defendant's sentence, we presume the trial court considered all the factors in mitigation, and that presumption cannot be overcome without evidence from the record demonstrating that the trial court did not consider mitigating factors. *People v. Flores*, 404 Ill. App. 3d 155, 158 (2010). We will defer to the trial court's judgment since, "having observed the defendant and the proceedings, it had the opportunity to weigh defendant's demeanor, credibility, general moral character, mentality, habits, social environment, and age." *People v. Sandifer*, 2017 IL App (1st) 142740, ¶ 81 (citing *People v. Alexander*, 239 Ill. 2d 205, 213 (2010)). We may not reweigh the factors considered by the trial court. *Flores*, 404 Ill. App. 3d at 158. In addition, the existence of mitigating factors does not mandate the imposition of a minimum sentence, nor does it preclude the imposition of the maximum sentence. *Id.*

¶ 49    Defendant fails to assert any evidence that the trial court did not consider defendant's employment history, education, psychiatric disorder, age, cost of incarceration, and community support. At sentencing, the trial court stated that it considered the PSI, counsel's arguments, defendant's petition, and the statutory factors in aggravation and mitigation.

¶ 50    The PSI includes information that defendant argues the trial court did not consider. Defendant's entire employment history is contained within the PSI, and during defendant's sentencing hearing, defense counsel emphasized that defendant "has been gainfully employed" and noted each job defendant has had—first he worked at a gas company, then at a toy store, and

then as a self-employed contractor for 20 years leading up to his incarceration. Defendant's education is also in the PSI. It states that while defendant was incarcerated, defendant obtained his GED and completed college courses. Defense counsel brought up defendant's education at sentencing. The PSI contains defendant's health history. It notes that, at age 25, defendant was first treated by a medical health professional who diagnosed defendant with manic depression and bipolar disorder. The PSI further notes that, since he was 25, he has been taking psychotropic medication. In addition, the PSI contains defendant's age, and defendant does not assert any evidence that the trial court did not consider defendant's cost of incarceration.

¶ 51     As to defendant's community support, the trial court stated, "I have looked at the petition that's printed by the defense." As defense counsel explained at sentencing, that petition was signed by 52 individuals who lived in defendant's community. The petition stated that defendant had helped the petitioners carry their groceries, clean their gutters, and mow their lawns. The petition further stated that defendant's incarceration left a void in the community.

¶ 52     Finally, we emphasize the seriousness of defendant's crimes. See *Willis*, 2013 IL App (1st) 110233, ¶ 123. Defendant entered Shaneka's vehicle while T.M. was sleeping, drove T.M. to a vacant lot, and as she woke up, brandished a firearm and threatened her. While he was holding a firearm, he forced T.M. to perform oral sex and ejaculated on her and her clothing. Defendant then attempted to take her clothes off and steal any money in the vehicle. T.M. could escape only by running barefoot through an abandoned lot with broken glass and was taken to the hospital for treatment. T.M. testified that she was traumatized.

¶ 53     We therefore find that defendant's sentence was not manifestly disproportionate to the nature of his offenses. See *Jackson*, 375 Ill. App. 3d at 800. Accordingly, we find that the trial court did not abuse its discretion. There is no basis to disturb the trial court's judgment.

¶ 54                                    CONCLUSION

¶ 55    For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 56    Affirmed.

---

**No. 1-17-1145**

---

| | |
|---|---|
| **Cite as:** | *People v. Towns*, 2020 IL App (1st) 171145 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 14-CR-1867; the Hon. William G. Lacy, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Aliza R. Kaliski, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Annette Collins, and Krista S. Peterson, Assistant State's Attorneys, of counsel), for the People. |

---