2023 IL App (1st) 220125-U

No. 1-22-0125

August 29, 2023

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 60021 |
| | ) | |
| ROBERT WALLACE, | ) | Honorable |
| | ) | Ursula Walowski, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Ellis concurred in the judgment.

ORDER

¶ 1     *Held*:  We affirm defendant's conviction for first degree murder. No preliminary *Krankel* inquiry was required where defendant did not claim he received ineffective assistance of trial counsel. The trial court did not abuse its discretion in imposing a 45-year sentence.

¶ 2     Following a jury trial, defendant Robert Wallace was convicted of first degree murder (720

ILCS 5/9-1(a)(1) (West 2018)) and sentenced to 45 years' imprisonment. On appeal, he argues

that the trial court erred in failing to perform a preliminary inquiry pursuant to *People v. Krankel*,

102 Ill. 2d 181 (1984). He also argues his sentence is excessive as he was 25 years old at the time of the offense, lacked criminal history, and has schizophrenia. For the following reasons, we affirm.

¶ 3     Defendant was charged by indictment with multiple counts relating to the death of his mother, Betty Wallace, sometime between December 18, 2018, and December 24, 2018.[1] The State ultimately nol-prossed all but two counts of first degree murder, premised on defendant's intentional or knowing killing of Betty or infliction of sharp wounds upon her knowing his act created a strong probability of death or great bodily harm to her.

¶ 4     At a hearing on September 10, 2020, defendant requested leave to file a *pro se* motion for a new attorney. The court declined as defendant was represented by the Public Defender's office, which selected the attorneys.

¶ 5     On October 6, 2020, the court held a fitness hearing. The parties entered a stipulation that, if called, a psychologist would testify that she examined defendant and reviewed, *inter alia*, police reports, videos, and defendant's psychiatric-social history. Relevant here, defendant had a history of psychiatric hospitalization and had been diagnosed in 2015 with bipolar disorder and schizoid affective disorder, bipolar type. He was interviewed by a psychiatrist several times in late December 2018, following his arrest in this case, and appeared to be delusional but not grossly disorganized or responding to internal stimuli. He reported being diagnosed with schizophrenia but did not believe he had schizophrenia. In 2019 he refused medication; but in 2020 he requested

---

[1] As defendant and his mother share a surname, we refer to defendant's mother by her first name. We note that, at a pretrial hearing, defendant testified and referred to Betty as his foster mother. This is the only such reference in the record, which also shows Betty was married to defendant's father and raised defendant.

to restart medications to help with anxiety, sleep problems, and mood swings. The psychiatrist opined defendant was fit to stand trial. The court found defendant fit.

¶ 6    On September 29, 2021, defendant requested leave to speak in court. The court said no and instructed him to talk to his lawyer and not speak on the record. Defendant stated he mailed the court a form, which counsel explained was an untimely *pro se* motion for substitution of judge. The court told defendant the motion was improper.

¶ 7    On the day of trial, before jury selection, counsel informed the court that, earlier that day, defendant stated he had sent counsel a letter regarding a witness that was "crucial to his defense." Defendant told the court he did not know the witness's name but defendant believed the person was the murderer and had been living "at that place." Defendant offered the name of a person in jail who might be related to the suspect and stated he knew an address where the suspect might live. Defendant repeatedly interrupted the court until the court threatened to put him "in back" during trial. The court denied a continuance as the jury was "waiting outside," and an investigation would be "a wild goose chase."

¶ 8    At trial, Daniel Unold testified that, the afternoon of December 24, 2018, he was working on a garbage truck. In an alley on the 10800 block of South Prospect Avenue, in Chicago, Unold and his partner emptied a garbage cart into the truck. He then observed part of a body in the truck. The driver of the truck called it into dispatch and police officers arrived.

¶ 9    Chicago police detective Donald Clark testified that he responded to the alley. He observed what he later learned were Betty's "cut or mutilated" remains in the garbage truck, wrapped in blankets or towels. Half her face and some of her teeth were missing.

¶ 10     Clark was then called to Betty's home on the 10500 block of South Church Street, about three blocks away. Betty's family members had entered and observed blood. Clark searched the home and observed what appeared to be dried blood in the connected living and dining rooms. Some of the blood was covered with a white powder which Clark believed was boric acid. Boric acid is used to clean stains, and a bottle of boric acid was nearby. Officers further discovered a human tooth and a book on removing stains.

¶ 11     While Clark and other officers searched the house, defendant arrived around 9 or 9:30 p.m. in a silver Ford Taurus. Defendant stated the vehicle was Betty's. He wore a black and white striped jacket that smelled of blood and appeared to have blood on the sleeve. Officers handcuffed defendant and he stated he had a knife. Officers discovered two small knives on his person. They walked him to a squad car and searched him again, recovering two four-inch knives in sheaths underneath his outer clothes. On cross-examination, Clark testified that the bottle with boric acid was bedbug killer.

¶ 12     The State entered a stipulation that, if called, an assistant medical examiner would testify that Betty died of homicide. She suffered four "chop" wounds to her head, three of which were more than three inches long; a five-inch by four-inch gaping wound on her face; several incise wounds on her left arm and hand; stab, incise, and gaping wounds to her left leg; a gaping wound on her right thigh; and, a four-inch incise wound and a stab wound on her right arm. She also suffered blunt force trauma injuries on her right hand, a fractured clavicle, and three fractured ribs "associated with right chest muscle hemorrhage." The medical examiner submitted a sample of Betty's DNA to the Chicago Police Department.

¶ 13    Paul Presnell, a Chicago police forensic investigator, testified that he examined a silver Ford Taurus. There were red stains on the inner panel of the driver's side rear door and driver's side rear seatbelt. A presumptive test for blood on the stain from the door panel was positive. Presnell removed and inventoried a portion of the seatbelt strap and clip.

¶ 14    Veronica Jackson, a forensic scientist for the Illinois State Police, testified that she examined a jacket, four knives, and a seatbelt strap. Tests indicated the presence of blood in stains on one of the knives, the jacket's sleeve, and seatbelt. The other three knives did not have blood stains. Jackson preserved samples of the blood-stained evidence for DNA analysis.

¶ 15    Stephanie Plazibat, a forensic scientist with the Illinois State Police, testified that she performed DNA analysis on samples of the blood-stained evidence. Samples of the jacket and knife had a mix of two DNA contributors. The major profile on each item was a full female profile. A sample of the seatbelt had only a full female profile. Betty could not be excluded from being the contributor of the female profile on each item, and only 1 in 290 nonillion unrelated individuals could not be excluded. On cross-examination, Plazibat testified that she did not receive a standard of the suspect's DNA to compare to the minor profiles from the jacket and knife.

¶ 16    The State rested. The defense entered a stipulation to the foundation of body-worn camera footage from police officers in the alley and at Betty's house. The defense published clips of that footage which are included in the record on appeal and have been reviewed by this court. The clips depict, *inter alia*, officers searching the house, handcuffing defendant, and recovering the knives.

¶ 17    Following argument, the jury found defendant guilty first degree murder.

¶ 18    Counsel filed a motion for a judgment of acquittal or a new trial. Relevant here, counsel asserted that the court erred in denying a continuance to investigate the possible suspect defendant

mentioned before trial. Counsel argued that, by doing so, the court denied defendant a fair trial, due process, and the effective assistance of counsel as the denial prevented counsel from sufficiently investigating the other suspect.

¶ 19   At a hearing on the motion, counsel stated he was resting on the motion. He noted that defendant had raised his hand. Counsel informed the court that defendant was "objecting to [counsel] even doing this motion. He doesn't want me to do it, but I'm doing it *** to protect his rights. But that's the reason he's raising his hand." The court responded, "Okay," and counsel continued, "Just so you have on the record he's opposing me doing a motion for new trial or a motion for judgment of acquittal." The court again responded, "Okay," and then prompted the State to argue the motion.

¶ 20   Regarding the court's denial of a continuance to investigate the possible suspect, the State argued that defendant raised the suspect on the day of trial and offered no real information. After the State concluded, counsel clarified that he and his partner received defendant's information about the other possible suspect "as the potential jurors were outside the courtroom." Although the court denied the defense a continuance, counsel's partner sought the person whom defendant named but did not find him, and counsels "continued to look into it." When counsel finished, the court told defendant to put his hand down. The court denied the motion.

¶ 21   The cause proceeded directly to sentencing. Defendant's presentence investigative report (PSI) noted that the investigator twice tried to interview defendant to prepare the PSI but defendant did not cooperate. However, counsel submitted to the investigator several documents regarding defendant's education and mental health history, which were appended to the PSI.

¶ 22     The appended documents include, *inter alia*, school records showing defendant was not disciplined for any violent incidents in school but was bullied and the victim of a "battery and robbery" by other students. The records indicate that throughout 2011 and 2012 he often broke school rules by refusing to remove his hat and disrupting class. He graduated high school in 2012. A psychosocial history compiled by Forensic Clinical Services through an interview with defendant's cousin indicated that there was domestic violence between defendant's parents and defendant may have been physically abused.

¶ 23     Medical records showed defendant was admitted to a hospital on February 28, 2015, when he was 21 years old. Betty had noted he had delusional thoughts and started a fire outside his apartment. He had not been taking medication and was hearing voices and responding to internal stimuli. He had a history of bipolar disorder. A doctor found defendant's thoughts extremely disorganized. He was placed on psychotropic medication, diagnosed with bipolar disorder and acute psychosis, and discharged from the hospital on March 4, 2015.

¶ 24     Defendant was readmitted for four days in May 2015, when the police brought him to the hospital "for exhibiting inappropriate behavior at home." He was unkempt and had disorganized thoughts. After responding to medication and therapy, he was diagnosed with schizoaffective disorder, bipolar type, and instructed to follow-up at a mental health clinic. The final diagnosis was schizophrenia. Betty requested defendant receive a Haldol shot. He returned to the hospital on June 14, 2015, and was discharged the same day. Betty had brought him after a neighbor observed him appear anxious and confused and he told Betty he had seen "a fog" in his room. The final diagnosis was acute psychosis and schizophrenia.

¶ 25    At the sentencing hearing, the court noted that counsel had tendered to the court the materials he gave the investigator for the PSI. The court noted that defendant had been found fit before trial, and counsel stated that nothing had changed regarding defendant's fitness since that hearing.

¶ 26    In aggravation, the State argued that defendant was a danger to society as he killed his mother in a "horrific way," inflicting "grotesque" wounds and dumping her body in a garbage can. The State requested a sentence of "several decades." The State confirmed that defendant had no criminal history.

¶ 27    In mitigation, counsel noted that defendant was 25 years old when he committed the offense and requested the court consider the factors provided in *People v. Buffer*, 2019 IL 122327, and *Miller v. Alabama*, 567 U.S. 460 (2012). Defendant experienced domestic violence in the home and likely suffered physical abuse. He graduated high school and attended some college. The changes in defendant's diagnoses indicated that his schizophrenia had been worsening over time. His mental illness prevented him from working. Schizophrenia tended to become "full-blown" around age 26, and imprisonment would impact his condition as the Department of Corrections was not equipped to handle defendant's condition. He had a good jail record. Counsel recited that the statutory mitigation factors included whether defendant suffered from a serious mental illness which was insufficient to establish an insanity defense but nevertheless substantially affected his ability to understand the nature of his acts or conform his conduct to the requirements of the law. Counsel requested a recommendation for counseling or treatment, a minimum 20-year sentence, and a modification to find defendant guilty but mentally ill.

¶ 28    The court then informed defendant it was his turn to speak in allocution, and he could say anything he wanted. Defendant told the court to impose whatever sentence the court felt so he could leave, as he was "not about to debate with the devil." He continued:

"I feel like we not about to—What's it called, acquit, what's it called when you come back? We not about to do all that s***. Just give me the sentence. Let's just go to the NRC. We trying to do this within a week. You got Corona going on. If it's going to take you a while, let's get the sentencing today or whatever or you going to call your bluff, whatever. I'm not about to keep doing this s***."

¶ 29    The court stated it had reviewed the facts of the case, and noted Betty had been stabbed numerous times and "gruesome[ly]" recovered in a garbage can. The nature of the crime was aggravating. The court had considered the factors in aggravation and mitigation, counsels' arguments, the PSI and reports from defense counsel, and defendant's mental health. Defendant needed mental health treatment but his mental health did not preclude him from being fit for trial or understanding the proceedings. The court merged the strong probability murder count into the intentional murder count (720 ILCS 5/9-1(a)(1) (West 2018)) and sentenced defendant to 45 years' imprisonment, recommending mental health treatment.

¶ 30    On January 18, 2022, counsel filed a motion to reconsider sentence. Pertinently, counsel argued that the sentence was excessive given defendant's background and that the court failed to properly consider mitigating evidence, including defendant's mental health. Counsel cited a number of authorities to provide information about schizophrenia, including online sources for which counsel provided links and other sources for which counsel provided the International Standard Book Number (ISBN). Among the latter, counsel cited to the Diagnostic and Statistical

Manual of Mental Disorders, 5th Edition (DSM-5) (American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 5th Edition, DSM-5 (2013)), and Ferri's Clinical Advisor (Fred F. Ferri, *Ferri's Clinical Advisor 2019* (Elsevier 2019)).

¶ 31 Counsel explained that schizophrenia usually develops in a person's late teens to early 30's, and peaks in males in the early to mid-20's. According to counsel's sources, schizophrenia decreases a person's life expectancy by 20 years due to its association with obesity, poor diet, smoking, a sedentary lifestyle and, to a lesser extent, an increased rate of suicide. It may cause, *inter alia*, delusions; hallucinations; the feeling that one's impulses, actions or thoughts are not generated by oneself; disorganized thinking; disorganized behavior such as unpredictable or inappropriate emotional responses; and extreme agitation. At least one-third of people with schizophrenia experience complete remission of symptoms, while others see their schizophrenia worsen over time or experience periodic worsening and remission.

¶ 32 The same day, the court held a hearing on the motion. Counsel requested the court reduce the sentence and consider finding defendant guilty but mentally ill. The State argued that counsel was speculating about the potential worsening of defendant's schizophrenia. The court found there was insufficient evidence to find defendant guilty but mentally ill. The court noted that it considered the "important and relevant" mitigating evidence in imposing sentence, including counsel's argument about defendant's mental health. As defendant was 25 years old when he committed the offense, the juvenile sentencing arguments counsel raised did not apply. The court denied the motion.

¶ 33 Defendant now appeals. He first argues that the court erred in failing to perform a preliminary *Krankel* hearing.

¶ 34    Pursuant to *Krankel*, 102 Ill. 2d 181, when a defendant raises a *pro se* posttrial claim that he received ineffective assistance of trial counsel, the court must examine the claim's factual basis and determine whether there was possible neglect by counsel. *People v. Jolly*, 2014 IL 117142, ¶ 29. If the claim lacks merit or pertains only to matters of trial strategy the court may deny the *pro se* motion. *Id.* If the allegations show possible neglect, however, the court should appoint new counsel. *Id.* The court's inquiry may involve a discussion of the allegations with the defendant or counsel, and the court may also consider its own knowledge of counsel's performance at trial. *People v. Jones*, 2019 IL App (1st) 170478, ¶ 36 (citing *People v. Ayres*, 2017 IL 120071, ¶ 12; *Jolly*, 2014 IL 117142, ¶ 30).

¶ 35    To trigger the court's duty to perform a preliminary inquiry, the defendant must bring his claim "to the trial court's attention." (Internal quotation marks omitted.) *Ayres*, 2017 IL 120071, ¶ 11. He may do so orally and need not file a written motion. *Id.* However, he must bring a "clear" claim. *Id.* ¶ 18. Further, although the procedure is intended to facilitate the consideration of *pro se* claims, the defendant's counsel may raise the issue of his own ineffectiveness "if he does so clearly and at the direction of the defendant," and alerts the court that he is raising the claim at the defendant's direction. *People v. Bates*, 2019 IL 124143, ¶ 33.

¶ 36    The issue here is whether defendant triggered the court's duty to perform a preliminary *Krankel* inquiry. That is a legal question we review *de novo*. *People v. Taylor*, 237 Ill. 2d 68, 75 (2010). We conclude that defendant did not make a clear claim of ineffective assistance, and the court therefore did not err in failing to perform a preliminary *Krankel* inquiry.

¶ 37    Defendant argues he brought a claim of ineffective assistance of counsel to the court's attention where he twice raised his hand during argument on the motion for a judgment of acquittal

or new trial: first when counsel rested on the motion, at which point counsel informed the court defendant raised his hand because he objected to counsel "doing" the motion; and again when counsel asserted that he and his partner had attempted to investigate the potential suspect despite the court's denial of a continuance. Neither time did the court allow defendant to speak.

¶ 38    The State notes that, when told he could say anything in allocution, defendant indicated only that he wanted the proceedings to end. Defendant counters that it was reasonable for him to merely raise his hand and remain silent when the court did not prompt him to speak as the court previously prohibited him from speaking on the record or filing *pro se* motions. Moreover, he contends his statement in allocution is irrelevant to what he might have said about counsel's performance. He maintains that by not allowing him to speak when he raised his hand, the court short-circuited the purpose of the *Krankel* proceeding, which is to make a record and allow the trial court to hear claims of ineffective assistance of counsel. See *In re Johnathan T.*, 2022 IL 127222, ¶ 43 (*Krankel* procedure is intended to establish facts underlying the ineffective assistance claim, create a record, and limit the issues on appeal).

¶ 39    We find that defendant did not clearly raise a *pro se* claim of ineffective assistance by raising his hand. Counsel's statement that defendant raised his hand because he did not want counsel to file the posttrial motion is open to multiple interpretations. As the State argues, it could mean that defendant did not want any posttrial motion filed on his behalf. Or, as defendant argues, it could mean that defendant did not want trial counsel, specifically, to file the posttrial motion on his behalf because he had taken issue with counsel's representation. Likewise, when defendant raised his hand a second time it may have been to disagree with counsel that counsels had tried to investigate the suspect. It may also have been to offer more information about the suspect, or

bolster counsel's argument that a thorough investigation had been impossible without a continuance, or anything else.

¶ 40   Defendant argues that the absence of information regarding what defendant would have said if allowed to speak shows that the court erred in failing to perform a *Krankel* inquiry. But courts are not required to conduct *Krankel* inquiries where a claim is subject to different interpretations. *People v. Thomas*, 2017 IL App (4th) 150815, ¶ 26 (citing *Taylor*, 237 Ill. 2d at 77). Moreover, defendant's statement in allocution bolsters the State's interpretation of defendant's conduct—that he did not want any posttrial motion filed. In allocution, defendant urged the court to "[j]ust give [him] the sentence," as he did not want to "come back" but wanted the sentence imposed that day.

¶ 41   Defendant contends that, as his statement came at sentencing after the court denied his posttrial motion, he had no reason to explain what he wanted to say earlier. However, the court told defendant it was his turn to speak and he could say anything he wanted. Nevertheless, he did not comment on counsel's performance. See *People v. Zirko*, 2012 IL App (1st) 092158, ¶ 72 (finding defendant failed to bring claim of ineffective assistance to court's attention where he made a brief statement at sentencing but did not mention the claim).

¶ 42   Defendant asserts he did not need to use the words "ineffective assistance" or explicitly state he was dissatisfied with counsel's performance to trigger a *Krankel* inquiry. See *Johnathan T.*, 2022 IL 127222, ¶¶ 7, 54 (minor-defendant raised claim in sex offender evaluation by telling evaluator he and his lawyer did not talk, he was not prepared for the stand, and his lawyer did not answer calls, as that indicated the lawyer "was not doing something that he should have been

doing"). While we agree that defendant did not have to use these specific terms, here, he made no statement implicating counsel's performance. *Johnathan T.* is therefore distinguishable.

¶ 43 Further, we find that counsel did not clearly raise a *pro se* claim of ineffective assistance of counsel on defendant's behalf. See *Bates*, 2019 IL 124143, ¶ 33 (for counsel to bring *pro se* claim on a defendant's behalf, counsel must raise the issue "clearly and at the direction of the defendant"). Counsel filed a motion arguing that the court erred by denying the continuance to investigate the other suspect defendant referenced, which denied defendant effective assistance of counsel by precluding counsel from conducting a sufficient investigation. However, counsel did not argue that he and his partner had performed deficiently under the circumstances. See *People v. Ramirez*, 2018 IL App (1st) 152125, ¶ 16 (in determining whether counsel was deficient, court considers all the circumstances and evaluates conduct from counsel's contemporaneous perspective). Moreover, as counsel indicated that defendant did not want counsel to litigate the motion, the claim was not brought at defendant's direction. We therefore cannot say that defendant brought a *pro se* complaint about counsel's performance through counsel to trigger the court's duty to perform a preliminary *Krankel* inquiry.

¶ 44 In conclusion, a court's duty under *Krankel* is only triggered upon a clear claim of ineffective assistance. *Bates*, 2019 IL 124143, ¶ 33. Here, because defendant did not raise such a claim and counsel did not raise one on his behalf, the court was not required to make any inquiry.

¶ 45 Next, defendant contends that his 45-year sentence is excessive. He argues that a 45-year term is essentially a life sentence given the low life expectancy of incarcerated persons and that his schizophrenia will likely decrease his life expectancy by approximately 20 years. He claims the court inadequately considered his rehabilitative potential as he had no criminal history,

completed high school, and has schizophrenia. Defendant asserts that, although he was not a minor, the combination of his age and schizophrenia indicate he has similar rehabilitative potential as a minor for purposes of *Miller*. Further, while horrible, the nature of his crime indicated it was a "chaotic crime committed by a 25 year old suffering delusions" rather than "a well-planned, cold-blooded murder."

¶ 46    The Illinois Constitution requires courts, when imposing sentence, to balance the seriousness of the offense with the objective of restoring the offender to useful citizenship. Ill. Const. 1970, art. I, § 11. The sentencing court has broad discretion and its decisions are entitled to great deference as it is better positioned than the reviewing court to weigh factors like the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *People v. Alexander*, 239 Ill. 2d 205, 212-13 (2010). Thus, we may not substitute our judgment for the trial court's merely because we would have weighed those factors differently. *Id.* at 213. Rather, when a sentence is within statutory limits, we will not disturb it absent an abuse of discretion, *i.e.*, unless it greatly varies with the spirit or purpose of the law or is manifestly disproportionate to the nature of the offense. *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000); see also *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46 (sentences within statutory range are presumptively proper and only disturbed if there is an affirmative showing that it varies with the law or is manifestly disproportionate).

¶ 47    While a sentence may be excessive if it fails to adequately reflect mitigating evidence and the defendant's rehabilitative potential (see *People v. Margentina*, 261 Ill. App. 3d 247, 249-50 (1994)), the presence of mitigating factors does not require a court to impose the minimum sentence (*People v. Towns*, 2020 IL App (1st) 171145, ¶ 48). The seriousness of the crime is the

most important factor (*id.*), and the court may weigh it more heavily than the defendant's rehabilitative potential (*Alexander*, 239 Ill. 2d at 214). Absent some affirmative indication otherwise, we presume the trial court considered the mitigating evidence presented. *People v. Perkins*, 408 Ill. App. 3d 752, 763 (2011).

¶ 48    As a threshold matter, we note that defendant has included in the appendix of his brief the pages of the DSM-5 and Ferri's Clinical Advisor that he cited in his motion to reconsider the sentence. There, he cited them for the proposition that schizophrenia typically onsets between a person's teens and early-30's, and peaks in males in the early-20's. Here, he cites them for that point and several others, including that: the treatment of schizophrenia may be pharmacological or not; most people who suffer from schizophrenia often switch between medications due to adverse side effects or to find the medication which works best for them; most who suffer from schizophrenia are not aggressive; aggression is most common in younger males; and, the symptoms of schizophrenia usually diminish over time. In addition to those sources included in his appendix, he cites the online sources that were also cited in the motion to reconsider sentence.

¶ 49    The State argues that we should strike or disregard the materials included in defendant's appendix and the portions of his brief referencing those materials as they were not included in the record on appeal. Defendant counters that, as trial counsel cited the materials before the trial court, they were before the trial court and we may consider them. We agree with the State. The issue is not whether citing the materials in the motion to reconsider put them in front of the trial court, but whether defendant may supplement the record on appeal, which does not include the materials, by appending them to his brief. We find that he may not.

¶ 50    The appendix to an appellant's brief must include "pleadings or other materials *from the record* which are the basis of the appeal." (Emphasis added.) Ill. S. Ct. R. 342 (eff. Oct. 1, 2019). An appellant may not include in the appendix a document absent from the certified record on appeal, which he is obligated to compile and present. *Insurance Benefit Group, Inc. v. Guarantee Trust Life Insurance Co.*, 2017 IL App (1st) 162808, ¶ 44; see also *People v. Wright*, 2013 IL App (1st) 103232, ¶ 38 ("The inclusion of evidence in an appendix is an improper supplementation of the record with information *dehors* the record."); *Zimmer v. Melendez*, 222 Ill. App. 3d 390, 394-95 (1991) ("[A]ttachments to briefs not included in the record are not properly before the reviewing court and cannot be used to supplement the record.").

¶ 51    Defendant argues that our courts regularly cite books and treatises, citing *In re Detention Of New*, 2014 IL 116306, ¶ 42, where our supreme court discussed the contents of DSM-5. There, however, the issue was whether scientific evidence presented at trial was generally accepted, which allowed the court to "consider not only the trial court record but also *** sources outside the record, including legal and scientific articles ***." (Internal quotation marks omitted.) *Id.* ¶ 39. That is not the case here. Thus, we will not consider the materials defendant appended to his brief. *Oruta v. B.E.W. & Continental*, 2016 IL App (1st) 152735, ¶ 32 (where party appends materials to brief that are not taken from record, reviewing court may strike the brief or disregard the inappropriate material).

¶ 52    Ultimately, however, our disposition does not turn on our independent review of the secondary sources defendant relies on. We are tasked with evaluating whether the trial court appropriately considered the evidence presented to it, not with weighing that evidence ourselves.

See *Alexander*, 239 Ill. 2d at 213 (reviewing court may not substitute its judgment for the trial court's merely because it would have weighed sentencing factors differently).

¶ 53    We turn to the merits of defendant's claim. The jury found defendant guilty of first degree murder. First degree murder carries a term of imprisonment between 20 and 60 years. 730 ILCS 5/5-4.5-20(a) (West 2018). The trial court sentenced defendant to 45 years' imprisonment. As his sentence is within the statutory sentencing range, we review it for an abuse of discretion. *Stacey*, 193 Ill. 2d at 209-10. Moreover, as the sentence is within the statutory range, it is presumptively proper unless defendant affirmatively shows otherwise. *Knox*, 2014 IL App (1st) 120349, ¶ 46. Defendant does not make that showing here.

¶ 54    First, we find defendant's arguments related to *Miller* and *Buffer* unavailing. *Miller* established that mandatory life sentences for juvenile offenders violate the eighth amendment. *Miller*, 567 U.S. at 469-80. *Buffer* established that a 40-year sentence is a *de facto* life sentence for a juvenile. *Buffer*, 2019 IL 122327, ¶¶ 40-41. Defendant, however, was not a juvenile when he committed the offense. He was 25 years old. Even though our courts have extended protections under *Miller* and its progeny to young adult offenders older than 18 years old, we have not extended them to offenders as old as defendant. See *People v. Robinson*, 2021 IL App (1st) 192289, ¶ 48 (24-year-old offender was "well past both the juvenile cutoff for eighth amendment *Miller*-based claims and the 18-to-21-year-old group of defendants who have asserted as-applied *Miller*-based claims under the proportionate penalties clause").

¶ 55    Moreover, *Miller* did not render all life sentences or *de facto* life sentences for a young adult offender improper. Rather, it rendered *mandatory* life sentences for juveniles unconstitutional because they prevented courts from considering factors such as the offender's

immaturity, impulsivity, and increased vulnerability to negative influences. *Miller*, 567 U.S. at 471-80. Nor did *Buffer* render sentences greater than 40 years unconstitutional for a youthful offender; it rendered them unconstitutional if imposed without consideration of the offender's "youth and attendant characteristics." *Buffer*, 2019 IL 122327, ¶ 42. Here, defendant was not subject to a mandatory life or *de facto* life sentence and, as will be discussed below, the court did not fail to consider defendant's relative youth or mental health issues. Rather, the record shows that the court explicitly considered these factors. Thus, *Miller* and *Buffer* are inapplicable.[2]

¶ 56    Defendant argues that the court focused too heavily on the nature of his crime at the expense of adequately considering his rehabilitative potential, including his age, lack of criminal history, and schizophrenia, which typically onsets in the early 20's but may diminish over time. He cites *People v. Treadway*, 138 Ill. App. 3d 899 (1985), in which the court halved the defendant's sentences for attempted murder and armed violence. Although the trial court had found the offenses were heinous, brutal, and indicative of wanton cruelty, this court found potential for rehabilitation demonstrated by, *inter alia*, the 24-year old defendant's minor criminal history, history of being abused, drug and alcohol problem, and his commission of the offenses in a "fleeting moment of intoxicated rage upon a stranger." *Treadway*, 138 Ill. App. 3d at 905; see also *People v. Smith*, 178 Ill. App. 3d 976, 985 (1989) (murder sentence excessive where court did not

---

[2] Although not cited by defendant, we note that this court has, in one instance, applied *Miller* to an offender older than 21. See *People v. Savage*, 2020 IL App (1st) 173135 (reversing summary dismissal of postconviction petition arguing that 85-year sentence violated proportionate penalties clause where defendant was 22 years old at the time of the offense and claimed his long-term drug addiction and youth rendered him the functional equivalent of a juvenile). However, defendant here was three years older than the defendant in *Savage*, and, unlike in *Savage*, the court here considered the relevant sentencing factors as discussed *infra*.

adequately weigh rehabilitative potential of minor who suffered from intellectual delays and had no prior criminal history).

¶ 57    However, the court was not required to weigh defendant's rehabilitative potential more heavily than the seriousness of his offense. *Alexander*, 239 Ill. 2d at 214. Here, the record demonstrates the trial court considered the rehabilitation potential defendant raises. First, the mitigation evidence was set forth in the PSI and counsel's supporting documents, and counsel vigorously argued that evidence. Counsel's arguments included that defendant was 25 years old at the time of the offense, was physically abused as a child, and did well in school until he neared graduation. Counsel detailed defendant's history of mental illness, argued his schizophrenia affected his ability to understand the nature of his acts or conform his conduct to the requirements of the law, noted that schizophrenia tended to become "full-blown" in a person's mid-20's, and argued that imprisonment would negatively impact defendant's condition. The court is presumed to have considered all mitigating evidence and argument presented. *Perkins*, 408 Ill. App. 3d at 763.

¶ 58    Further, in imposing sentence, the court specifically stated it had considered the factors in mitigation, the PSI and reports from defense counsel, defendant's "mental health," and counsel's arguments, demonstrating it did in fact consider all the mitigating evidence. The court also stated it considered the factors in aggravation, and found the nature of defendant's crime aggravating where Betty had been stabbed numerous times and "gruesome[ly]" recovered in a garbage can. After counsel filed and argued a motion to reconsider the sentence, the court again noted it considered the "important and relevant" mitigating evidence, including counsel's argument about defendant's mental health.

¶ 59 Thus, the record demonstrates the court considered the mitigating evidence, including defendant's schizophrenia, in imposing his sentence. We cannot disturb his sentence merely because we may have weighed the mitigating evidence differently. *Alexander*, 239 Ill. 2d at 213. And, as the trial court noted and defendant readily admits, the nature of his offense was extremely aggravating where he inflicted numerous, gruesome wounds on his mother and the evidence suggests he then drove her remains to an alley and deposited them in a garbage can. The seriousness of the crime is the most important factor (*Towns*, 2020 IL App (1st) 171145, ¶ 48), and here that crime included breaking Betty's clavicle and three ribs, knocking her teeth out, and stabbing her approximately 20 times, inflicting not only multiple inches-long chop wounds but a five-inch-by-four-inch gaping wound to her face. The detective testified that half her face was missing when her body was recovered. Unlike in *Treadway*, relied on by defendant, where the evidence showed the defendant committed his offenses "in a fleeting moment of intoxicated rage upon a stranger" (*Treadway*, 138 Ill. App. 3d at 905), nothing in the record shows the circumstances of Betty's murder beyond that she was defendant's mother, and we will not speculate as to those circumstances.

¶ 60 Ultimately, the record shows the court considered defendant's rehabilitative potential and, despite the aggravating nature of the murder, imposed a 45-year sentence, which is near the midpoint of the applicable sentencing range and 15 fewer years' than the maximum. 730 ILCS 5/5-4.5-20(a) (West 2018) (sentence for first degree murder is to be between 20 and 60 years' imprisonment). We cannot say that defendant's sentence is manifestly disproportionate to the nature of his offense or greatly varies with the spirit or purpose of the law. Thus, we affirm the sentence.

¶ 61     In sum, the court did not err by failing to conduct a preliminary *Krankel* inquiry or abuse its discretion when imposing the 45-year sentence. For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 62     Affirmed.