2024 IL App (1st) 220989-U

No. 1-22-0989

Order filed November 6, 2024

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 19 CR 14132 |
| RONALD FRANKLIN, | ) ) ) | Honorable James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MARTIN delivered the judgment of the court.
Justices Reyes and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Defendant's arson conviction and sentence are affirmed over his challenge to the sufficiency of the evidence and his claim that the trial court failed to consider mitigating evidence.

¶ 2   Following a bench trial, defendant Ronald Franklin was convicted of arson and sentenced to 14 years' imprisonment. On appeal, he argues that the State failed to prove his guilt beyond a reasonable doubt and that the court, in imposing sentence, considered improper aggravating factors

and failed to adequately consider mitigating evidence. For the following reasons, we affirm.[1]

¶ 3                                    I. BACKGROUND

¶ 4      On June 15, 2015, Tyler Bernicky was found stabbed to death outside a house on the 7800 block of S. Ingleside Avenue, in Chicago. Behind the house, Bernicky's vehicle was found aflame. Franklin was charged by indictment with Bernicky's murder and with arson, for knowingly damaging Bernicky's vehicle by fire. Franklin proceeded to a bench trial on these charges.

¶ 5                                          A. Trial

¶ 6                             *1. State's Case-in-Chief*

¶ 7      At trial, Chikoo Patel testified that, in 2019, he owned FX Auto Spa (FX), a car wash and mechanic shop in Chicago. Franklin and Bernicky both worked at FX. In early June 2019, Patel decided to terminate FX's lease and close the business. He informed Franklin that he could sell FX's equipment, including hydraulic vehicle lifts worth approximately $2000, and keep the proceeds.

¶ 8      Jesus Jara testified that he ran the mechanical department at FX and Franklin ran the car wash department. Jara identified a photograph of Bernicky, whom he knew as "Montana." After Patel announced he would not renew FX's lease, Franklin indicated he planned to sell the hydraulic lifts.

¶ 9      On June 13, 2019, two people came to the auto shop and spoke with Jara about the lifts. After Jara demonstrated that the lifts were operational, the individuals began disassembling the lifts. At some point, Bernicky spoke with the individuals and Bernicky left shortly afterward. Franklin arrived and asked Jara if Bernicky was there. He showed Jara that he was trying to phone

_____

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

Bernicky but his calls were going straight to Bernicky's voicemail. The next day, a "teary-eyed" Franklin told Jara that he still could not contact Bernicky, who was "crushing [his] dreams."

¶ 10    Tamika Kirkland, who dated Franklin, testified that in June 2019, Franklin lived with her on the 1800 block of W. Lake Street, in Chicago. Franklin told her that Bernicky "ran off" with approximately $2000 that he received from selling the hydraulic lifts. Franklin was "more hurt than he was upset."

¶ 11    Kirkland and Franklin slept at Kirkland's home on June 14, 2019, with Franklin planning to do a "mobile detail" the next morning. Kirkland testified before the grand jury that Franklin wanted to look for Bernicky the morning of June 15, 2019.

¶ 12    When Kirkland awoke early in the morning of June 15, Franklin was dressing for work. After Franklin left to do the "mobile detail," Kirkland went back to sleep. She awoke again and called Franklin at 5:44 a.m. but he did not answer. He called her five minutes later and they spoke for 37 minutes, until Franklin arrived home. He took a nap and then went to the auto shop.

¶ 13    Kirkland identified Franklin and his Mercury Grand Marquis automobile in People's Exhibit Nos. 27-29. People's Exhibit Nos. 27 and 28—still photographs taken from a gas station's exterior surveillance camera—depict a man parking and exiting a vehicle. The photographs are time-stamped 5:45 a.m. on June 15, 2019, with a notation that the time-stamp is six minutes fast. People's Exhibit No. 29 depicts the man purchasing items inside the gas station. Kirkland further testified that People's Exhibit No. 30, a photograph from a surveillance camera in an alley that was time-stamped 5:46 a.m. on June 15, 2019, depicted a vehicle that looked similar to Franklin's.

¶ 14    On cross-examination, Kirkland testified that she and Franklin had discussed barbecuing on June 16, 2019, which was Father's Day, but that nothing had "been decided." It was not unusual for Franklin to wake early for a private detailing job. Franklin was not out of breath or speaking

unusually on the phone the morning of June 15, 2019. He said the mobile detailing job had been cancelled.

¶ 15    The State entered a stipulation to the foundation of surveillance videos from a Marathon gas station at 7850 S. Martin Luther King Drive, in Chicago. The footage from these videos depicts an individual buying a lighter, charcoal lighter fluid, and toilet tissue at approximately 5:41 a.m. on June 15, 2019. The images comprising People's Exhibit Nos. 27-29 were taken from these videos. The State entered into evidence a certified copy of Franklin's vehicle records for a 2001 Mercury Grand Marquis sedan with license plate BF76864.

¶ 16    Deonte Williams, Bernicky's friend, testified that he worked at FX with Bernicky and Franklin. In June 2019, Williams sometimes stayed at a house on the 7800 block of S. Ingleside Avenue, in Chicago. Bernicky often stayed in the house's backyard. On June 13, 2019, Bernicky told Williams that FX was "over with." Williams acknowledged previously giving a statement indicating that Bernicky said later that day that he had "sold some lifts and pocketed" about $2000, which he showed Williams.

¶ 17    Williams arrived at the Ingleside house early on June 15, 2019. He identified himself arriving in a still photograph, time-stamped 5:16 a.m., from a video recorded by a surveillance camera located near the house. Williams observed Bernicky sleeping inside his van, which was parked behind the house. A man nicknamed "Black" was there as well, as was Black's BMW. Williams entered the house and went to sleep.

¶ 18    Twenty or thirty minutes later, Brandon West, another occupant of the house, woke Williams and stated that Bernicky's vehicle was on fire. Through a window, Williams observed Bernicky's van "engulfed" in flames. Black's BMW was gone. Williams and West exited the house, running out the front door rather than the back because "[t]he flames were too far," and

"blasts [had] spread and [they] didn't know if the car was going to blow up." In front of the house, they encountered Bernicky injured on the ground. Williams ran to the corner for help but Bernicky died.

¶ 19    Williams identified People's Exhibit No. 4 as a photograph portraying the van "engulfed" in flames. The photograph depicts a vehicle several feet from a house, with flames rising a few feet above the vehicle. Thick, dark smoke rises higher than the house. Another vehicle is parked next to the one on fire.

¶ 20    West testified that he was Bernicky's cousin and lived in the house on Ingleside. Bernicky usually slept in the backyard in his minivan. West arrived home between midnight and 2 a.m. on June 15, 2019. He saw Bernicky and another individual asleep inside Bernicky's van. West entered the house and slept on a couch in the front room. He awoke and, through a window, saw someone on the ground in front of the house. Thinking it might be Bernicky, he went to the back of the house to see if Bernicky was still in his van. He saw the van was "up in flames," woke the house's other occupants, and approached Bernicky. He called 911 and told the others to find police.

¶ 21    Virgil Lamb testified that he also lived at the Ingleside house. After being awakened, he ran outside with West and saw Bernicky on the ground. Lamb ran to the intersection of Ingleside and 79th Street for help. A police officer drove by and Lamb directed him towards Bernicky. Lamb also saw a homeless man who stored his clothes behind the house approaching the back of the house. Lamb told him to stop because of the fire.

¶ 22    Lamb testified that video clips from surveillance cameras in the area depicted him discovering Bernicky and seeking help. The State published the clips and Lamb testified that one video depicted him signaling the homeless man not to approach the back of the house, although

the man was not visible on screen.[2] Lamb demonstrated the gesture he made to the homeless man, which the court stated was "a cutting gesture across the neck, like, a do not go type of gesture."

¶ 23 An assistant medical examiner testified that Bernicky's manner of death was homicide, with multiple sharp force injuries and no evidence of smoke inhalation.

¶ 24 William Warrior testified that he was nicknamed "Black," and had been friends with Bernicky. A few weeks before he died, Warrior had sold Bernicky a minivan. However, Bernicky had not obtained title to the van "because he was trying to get the rest of the money," which was "no big thing because [Bernicky] was [Warrior's] friend." The State entered vehicle records demonstrating that a 2003 Dodge Caravan was registered to Warrior.

¶ 25 On the night of June 14, 2019 and into early the next morning, Warrior and Bernicky were in the minivan, parked behind the Ingleside house. They drank and smoked. Bernicky told Warrior he had around $2300. They fell asleep in the van, which they did often. Warrior woke between 5 and 5:20 a.m. and awoke Bernicky to tell him he was leaving. As Warrior left, no one was outside the van.

¶ 26 Warrior identified surveillance video clips and a photograph which depicted his vehicle exiting an alley and driving away from the Ingleside house that morning. Warrior further identified a photograph of the Ingleside house taken from above, which showed the parking area behind the house, bordered by an alley.

¶ 27 Chicago police detective William Levigne testified that he was assigned to Bernicky's case around 7 a.m. on June 15, 2019. He arrived at the Ingleside house and recovered approximately

---

[2]The videos were People's Exhibit Nos. 14 and 15. They are not included in the record on appeal. Although they are listed on the impound order, they are crossed out. However, as discussed *infra*, the clips were part of a composite video that the police created while investigating the case, which is included in the record on appeal.

$1800 from Bernicky's pockets. Behind the house was a burned vehicle. The fire had been extinguished and the interior was "completely charred."

¶ 28    Levigne obtained surveillance videos from a building south of the Ingleside house, a Food Town grocery store on 79th Street, police pod cameras in the area, and the Marathon gas station. He testified that the videos depicted Warrior's vehicle, travelling south, leaving the alley to the east of Ingleside, and turning west onto 79th Street. A Grand Marquis was observed leaving the Marathon gas station, which was on the 400 block of 79th Street. The Grand Marquis then travelled east to the same alley and turned north into the alley approximately 15 to 20 minutes after Warrior left. The videos further depicted Lamb relocating to 79th Street, standing in the street looking east, and making a "furtive" throat-slashing motion. Around the same time, a Grand Marquis drove by, west on 79th Street. Levigne learned that the Grand Marquis's license plate number was different from the license plate of the Grand Marquis at the gas station.

¶ 29    The parties stipulated that police lab technicians would testify that they used the footage Levigne obtained to create a compilation video showing a timeline of relevant events. Levigne identified the compilation video and the State published it. Levigne also identified a map highlighting the Grand Marquis's route as depicted in the composite video.

¶ 30    The compilation video is consistent with Levigne's testimony. Williams arrives at the Ingleside house at 5:16 a.m. At 5:24 a.m., Warrior's vehicle exits the alley behind the house and turns left on 79th Street. The video depicts Franklin and his Grand Marquis arriving at the gas station, parking, and exiting the vehicle at about 5:40 a.m. Franklin enters the gas station and purchases the lighter fluid, toilet paper, and lighter. Franklin reenters his vehicle and drives out of the parking lot, turning onto 79th Street at 5:44 a.m. Franklin travels on 79th Street behind a black sedan. At 5:46 a.m., Franklin turns north from 79th Street into the alley that Warrior had left earlier.

As the vehicle enters the alley, it passes underneath a camera, and its brake lights activate. It is from this camera footage that the still frame in People's Exhibit No. 30 was taken, depicting a vehicle that Kirkland testified looked like Franklin's.

¶ 31    At 5:52 a.m., smoke can be seen rising above the multi-story building on the corner of 79th Street and Ingleside. At 5:54 a.m., the video captures people discovering Bernicky's body on the sidewalk. A man jogs towards the intersection and, facing east, makes a throat-slashing gesture. A vehicle similar to Franklin's then drives west through the intersection.[3] The man turns to face west and waves.

¶ 32    Levigne further testified that he sent Franklin's cell phone to a police computer lab for extraction.

¶ 33    On cross-examination, Levigne testified that police searched and processed Franklin's vehicle, and photographs taken at that time showed rust near the right rear and left front wheel wells and damage to the rear bumper. The photographs are consistent with his testimony. Levigne further testified there was an eight-block stretch on 79th Street, between pod cameras, where Franklin's vehicle could have turned off the road. The camera that captured the Grand Marquis entering the alley did not capture the vehicle's license plate or any rust spots.[4]

---

[3]A close review of the exhibit reflects that, unlike the vehicle at the gas station, identified as Franklin's, or the vehicle that enters the alley, the similar vehicle that drives through the intersection after Lamb's signal has a hood ornament.

[4]Police officers also discovered a red lighter in the grass near the Ingleside house. However, a close review of the exhibits demonstrates that it is not the same red lighter that Franklin was identified purchasing at the gas station. People's Exhibit No. 82, a photograph of the lighter found in the grass, shows that lighter had an opaque body, a "Bic" logo, and that the trigger mechanism on top included a red component. The lighter Franklin purchased, both sides of which are visible in the video of him purchasing it, had a translucent body, no Bic logo, and a black stripe beneath the trigger mechanism, which is silver and larger than the one in People's Exhibit No. 82.

¶ 34    The parties stipulated that another police officer would testify he prepared extraction reports comprising data from a cell phone. A 13-page extraction report includes incoming and outgoing calls and messages and online searches from around the time of Bernicky's death. The report shows that, between 10:32 a.m. and 2:21 p.m. on June 13, 2019, a phone number registered to Franklin exchanged numerous incoming and outgoing phone calls with a number saved as "Montana." Then, between 3:08 p.m. on June 13 and 3:27 p.m. on June 14, Franklin called Montana 13 times. Around 4 p.m. on June 13, Franklin texted Montana asking, "Why you not answering the phone[?]" At 7:35 p.m., he texted "On my way! To Montana house!" At 3:27 p.m. on June 14, 2019, he texted "You took that?" At 5:13 p.m. he texted, "Just so you know. They gave me the green light to stay. Now I don't have the money thanks for destroying the dream."

¶ 35    The parties further stipulated that a data scientist, using call records from Franklin's cell phone number, had created maps indicating the cell phone towers with which the phone communicated in June 2019. The maps demonstrate that Franklin's cell phone connected with a tower near the Ingleside house when he received a phone call from Kirkland at 5:43 a.m. on June 15, 2019. At 5:49 a.m., he called Kirkland via a tower near 79th Street and Cottage Grove Avenue—the same tower used in a 5:54 a.m. 911 call regarding the discovery of Bernicky's body.

¶ 36    Lee Greenwood, a former detective in the Chicago police arson unit, testified as an expert witness in arson investigations. He was assigned to the fire of Bernicky's van around 7 a.m. on June 15, 2019, and went to the scene. He learned that a suspect had "purchased some items" from a gas station and had then been captured on video driving into the rear alley behind the property just before the fire was discovered.

¶ 37    The van was "completely burned out." A photograph depicting the van with the front passenger door open and no glass in the windows reflected how the van appeared when Greenwood

arrived. A vehicle parked on the van's driver's side had suffered heat damage. There was more damage to the front of the van than the rear. Due to an excess of debris on the driver's side—which indicated the passenger's side dashboard was more "burned out" than the driver's side—Greenwood believed the fire originated near the passenger side dashboard and "roll[ed]" back through the vehicle. In his experience investigating fires, he has observed that a number of vehicle arsons occur from an individual pouring a liquid down the windshield and igniting it with an open flame, as it "is the quickest way to disable a car." Considering his observation of the van and his knowledge of the suspect's actions, Greenwood determined the van was intentionally ignited, and that the cause of the fire was arson. Greenwood took a sample of fire debris from under the front passenger seat.

¶ 38    On cross-examination, Greenwood testified that he did not ask the firefighters whether the front passenger door or window was open when they arrived. If the front passenger window had been the only open window, the fire would have rushed to that area even if it had originated elsewhere. His opinion that the fire went from the front to the back was based solely on the burn pattern. The van's gas tank cover was open but that did not affect his opinion about the cause or origin of the fire, as the damage around it was consistent with the fire "rolling back." If the fire had started there and rushed toward the open passenger window, it might have left the same burn pattern but would still be considered arson.

¶ 39    Greenwood believed an accelerant had been poured onto the interior and exterior of the vehicle and ignited by an open flame in the passenger compartment. He believed an accelerant had been poured on the windshield, as Greenwood had seen similar burn patterns in other cases where this had occurred. He did not take samples from the vehicle's exterior to test for an accelerant there. He testified he searched the van's interior for evidence of alcoholic beverages, such as

broken bottles. The sample he took from the front passenger floorboard contained ethyl alcohol, which could have come from a spilled alcoholic beverage. Detectives informed Greenwood that they had observed video of a suspect purchasing a lighter. Greenwood's progress report indicated that he took a vial of liquid from a red gas can that was found in a shopping cart near the van.

¶ 40    Illinois State Police forensic scientist Robert Dubbert testified as an expert in fire debris analysis. He found ethyl alcohol in debris from the van. Ethyl alcohol was used as a fuel additive in some types of gasoline but was most commonly in alcoholic beverages. He did not analyze the amount of ethyl alcohol and could not say where it came from. He found a small amount of an unidentified petroleum product in a vial of liquid and tried but failed to ignite it; the liquid seemed to be mostly water.

¶ 41                          *2. The Defense's Case-in-Chief*

¶ 42    The defense entered stipulations to the foundation of Defense Exhibits No. 17 and 18, which were entered into evidence. Defense Exhibit No. 17 was a surveillance video from Happy Food and Liquor Store at 7901 S. Cottage Grove. The footage was recorded between 5:44 and 6 a.m. on June 15, 2019, although the time-stamp was 44 minutes slow. The footage depicts a vehicle similar to Franklin's passing the store when the playback time shows 5:01 a.m. The vehicle follows a black sedan similar to the one Franklin followed in the composite video. According to the stipulation, Defense Exhibit No. 18 was a surveillance video from a Falcon Fuel gas station at 834 E. 79th Street, recorded between 5:44 and 5:48 a.m. on June 15, 2019. However, "[i]t was later determined that the time-stamp on the video was 15 minutes slow and the relevant time was not captured on the portion of the video inventoried." The police did not review the footage. Defense Exhibit No. 17 is included in the record on appeal but Defense Exhibit No. 18 is not included in the record on appeal or listed on the impound order.

¶ 43    Marc Fennell testified as an expert in fire origin and cause investigations. Fennell reviewed photographs and Greenwood's reports and testimony. He opined that no evidence supported that the fire was caused by an incendiary act. Relevant National Fire Protection Association (NFPA) guidelines prohibited strictly using burn patterns to determine the origin or cause of a fire. Greenwood's opinion that the fire began in the front passenger area was scientifically invalid, as he did not eliminate other possible sources of ignition such as the engine line, alternator, batteries, and electrical components. If an accelerant had been poured on the windshield, Fennell would expect to observe more damage to the front of the vehicle than that depicted in the photographs he reviewed, and scorch marks and melted plastic would be found on the ground.

¶ 44    Fennell would have collected more debris than Greenwood did, including from areas inside and outside the van. He also would have asked the firefighters if any of the vehicle's doors or windows had been open. The evidence did not satisfy NFPA guidelines for inferring that the fire was ignited by an open flame, and did not suggest the involvement of charcoal lighter fluid or toilet paper. It was possible for smoke to rise four stories in two minutes if gasoline had been poured on top of the vehicle and ignited.

¶ 45    On cross-examination, Fennell viewed People's Exhibit No. 4, a photograph of the van on fire, and testified the fire was "[v]ery intense" and the van was "fully engulfed." There were flames inside the vehicle, on the front of the vehicle, and some on the ground by the passenger side where an accelerant would have fallen and ignited. The damage amounted to "a total burnout," which meant that any accelerant may have expired. On redirect examination, Fennell testified that it was equally likely that (1) the fire burned for only a few minutes before the smoke became visible or (2) it burned for 20 minutes before the smoke became visible.

¶ 46    Following argument, the court found Franklin guilty of arson and not guilty of murder. The court denied Franklin's motion to vacate the guilty finding or grant a new trial.

¶ 47                                B. Sentencing

¶ 48    Franklin's presentence investigative report (PSI) reflected that he was 34 years old on the date of the offense. He had a GED and certificates in electrical construction maintenance and "Auto Body." He had been married since 2017, to a woman other than Kirkland, and had three children with his wife, aged 11, 3, and 2. He left his gang affiliation in 2013. He had no drug or alcohol dependencies. He was receiving treatment for depression and a sleeping disorder. Between FX and a mobile vehicle detailing business, he earned between $4000 and $6000 monthly. He had been convicted of six prior felonies: a 2002 possession of a controlled substance; a 2005 possession of a controlled substance; unlawful use or possession of a firearm by a felon in 2006; a 2006 delivery of a controlled substance; a 2009 possession of a controlled substance; and a 2013 delivery of a controlled substance. He also had a 2002 misdemeanor conviction for criminal trespass to a vehicle.

¶ 49    At the sentencing hearing, the parties agreed that Franklin's 2013 conviction was for a Class 2 offense and qualified him for an extended-term sentence of up to 14 years' imprisonment for the Class 2 arson offense. As Franklin was acquitted of Bernicky's murder, defense counsel objected to the State introducing a victim impact statement from Bernicky's father, as it related to Bernicky's murder. The court overruled the objection. Bernicky's father wrote that he and Bernicky's mother had suffered daily since Bernicky was "found murdered," and it hurt that Bernicky would never see his children again. He requested the "harshest" possible sentence.

¶ 50    In aggravation, the State cited Franklin's criminal history. The State noted that at the time of his offense, he was living with Kirkland rather than his wife and children. He committed the

instant offense over losing approximately $2000, despite his monthly earnings of $4000 to $6000. He took "concentrated steps" and executed a plan to commit the offense.

¶ 51    In mitigation, counsel submitted several character letters in which people referred to Franklin as "upstanding," "a source of hope" and a pillar in the community, a good teacher, and a hard worker. He employed people from underprivileged communities who struggled to find work. Counsel argued that the court could not consider in aggravation any suspicion that Franklin had murdered Bernicky. Further, since Franklin's last conviction in 2013, he had received training, started a business, and contributed to his community by employing others. He had a family. Nobody had been in the burned minivan. Counsel requested a sentence near the three-year minimum.

¶ 52    In allocution, Franklin stated that he had started his own business and wanted to show young people that prior crimes were "not the end," and that they could become productive citizens. He loved his employees. He should have called the police about Bernicky taking the lift money.

¶ 53    The court noted that it had heard the evidence and wanted to "be crystal clear" that "in no way" would it punish Franklin for Bernicky's death. The court recognized that Franklin employed those who had difficulty finding jobs, and that he supported himself with a legitimate business. However, Franklin had a "significant" criminal history, had been to prison several times, and committed the arson "because he was angry and vengeful" about Bernicky taking the money from the lifts. The fire occurred "inches" from an occupied home, in a space where homeless people stored clothes and where other vehicles were parked. Thus, the fire could have been deadly had it expanded, and the court had to consider the seriousness of the offense. Franklin acted with malice and premeditation and endangered the community because of "a personal vendetta." The court

imposed a maximum, extended-term 14-year sentence. The court denied Franklin's motion to reconsider the sentence.

¶ 54                                    II. ANALYSIS

¶ 55                          A. The Sufficiency of the Evidence

¶ 56    On appeal, Franklin argues that the State failed to prove his guilt beyond a reasonable doubt. Specifically, Franklin contends that the State failed to prove the *corpus delicti* of his arson offense or his identity as the offender.

¶ 57    When a defendant challenges the sufficiency of the evidence, the question is "whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the required elements of the crime beyond a reasonable doubt." *People v. Sauls*, 2022 IL 127732, ¶ 52. We do not retry the defendant. *Id.* It is the factfinder's role to "resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts." *Id.* Accordingly, we will not substitute our judgment for the factfinder's on questions involving the weight of the evidence or credibility of witnesses. *Id.* We will not reverse a conviction unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. *Id.*

¶ 58    The same standard applies whether the evidence is direct or circumstantial. *People v. Mosley*, 2023 IL App (1st) 200309, ¶ 17. Circumstantial evidence is proof of facts or circumstances from which a factfinder may infer other connected facts tending to establish the defendant's guilt or innocence. *People v. Cline*, 2022 IL 126383, ¶ 34; *People v. Harris*, 2023 IL App (1st) 210754, ¶ 77. The factfinder need not "be satisfied beyond a reasonable doubt of every link in the chain of circumstantial evidence" if all the evidence, taken together, proves guilt beyond a reasonable doubt. *Harris*, 2023 IL App (1st) 210754, ¶ 77. Further, the factfinder "need not search out all

possible explanations consistent with innocence and raise them to a level of reasonable doubt." *Cline*, 2022 IL 126383, ¶ 34.

¶ 59    Here, Franklin was charged with arson in that he, by means of fire or explosive, knowingly damaged another's personal property worth $150 or more without that person's consent. 720 ILCS 5/20-1(a)(1) (West 2018).

¶ 60    Proof of an offense requires proof that (1) a crime occurred, known as the *corpus delicti*, and (2) the defendant committed the crime. *People v. King*, 2020 IL 123926, ¶ 53. The *corpus delicti* of arson requires (1) a burning, and (2) that the fire was of incendiary origin. *People v. Kluppelberg*, 257 Ill. App. 3d 516, 537 (1993). In other words, the State must prove that a burning occurred, and that someone was criminally responsible for it. *People v. O'Neil*, 18 Ill. 2d 461, 463 (1960). Franklin argues that the State failed to prove the burning of Bernicky's van was caused by a fire of incendiary origin for which someone was criminally responsible. We disagree.

¶ 61    Greenwood, an expert in arson investigation, testified that the fire was intentionally set. The burn pattern comported with other arsons he had investigated where an accelerant had been poured on a vehicle and ignited with an open flame. His opinion accounted for the fact that a suspect had purchased items, including a lighter, before driving into the alley.

¶ 62    Franklin challenges the basis for Greenwood's opinion, noting that Greenwood collected no evidence of an accelerant from the van's exterior. He argues that ethyl alcohol, most commonly found in alcoholic beverages, was the only possible accelerant found in the van's interior, and Warrior and Bernicky were drinking and smoking in the vehicle. Further the burn pattern did not exclude the possibility that a fire began elsewhere in the van and rushed towards the open front passenger window. Franklin argues that the fire could have ignited from "for example, a spark from a cigarette, an electrical spark, or a static electric charge" that occurred while someone

attempted to put gas in the van, as the gas tank cover was open and a gas can was nearby. Fennell testified that a burn pattern was insufficient to establish the cause or origin of a fire, he critiqued the thoroughness of Greenwood's investigation, and he found the evidence insufficient to conclude that the fire was caused by an incendiary act.

¶ 63    Despite Franklin's arguments, a rational trier of fact could find that the fire was intentionally set. Although Fennell criticized Greenwood's investigation and opinion, he also testified that the fire burning on the ground next to the vehicle could be caused by an accelerant that fell from the van. He stated that if someone had ignited an accelerant on the van's exterior, the smoke could rise four stories within two minutes. Both possibilities comport with Greenwood's opinion and the State's theory that Franklin started the fire after entering the alley.

¶ 64    Greenwood's opinion is also supported by circumstantial evidence. Circumstantial evidence may prove the *corpus delicti*, which, like any other element of an offense, must simply be proven by competent evidence beyond a reasonable doubt. *People v. Jones*, 22 Ill. 2d 592, 595-96 (1961). Further, the evidence establishing the *corpus delicti* need not be entirely independent of the evidence that implicates the accused. *O'Neil*, 18 Ill. 2d at 463-64.

¶ 65    The circumstantial evidence here demonstrates that Franklin felt slighted by Bernicky, who kept the money from selling the hydraulic lifts. Franklin called and texted Bernicky repeatedly in the days before the arson. Kirkland testified to the grand jury that Franklin wanted to look for Bernicky the morning of June 15, 2019. She identified Franklin as the person who, around 5:40 a.m. that morning, purchased a lighter, charcoal lighter fluid, and toilet paper from a gas station. The composite video depicts him leaving the gas station and driving east towards Ingleside, a few minutes' drive away. At 5:46 a.m., a vehicle very similar in appearance to Franklin's entered the alley behind the Ingleside house, where Bernicky's van was parked. A few minutes later, smoke

rose above a nearby multi-story building. When Franklin called Kirkland at 5:49 a.m., his cell phone connected to a tower at 79th Street and Cottage Grove—the same cell tower used in the 5:54 a.m. 911 call regarding the discovery of Bernicky's body.

¶ 66    Greenwood's testimony and the proffered circumstantial evidence, when viewed as a whole and in the light most favorable to the State, is not so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt that the fire was intentionally set. See *O'Neil*, 18 Ill. 2d at 463-64 (*corpus delicti* need not be proven by evidence completely independent of that implicating the accused); see also *Harris*, 2023 IL App (1st) 210754, ¶ 77 (State need not prove every link in chain of circumstantial evidence beyond a reasonable doubt).

¶ 67    Franklin next argues that, even if the State proved the *corpus delicti*, it did not prove his identity as the person who set the fire. He asserts that his purchase of a lighter, lighter fluid, and toilet paper was "not unusual," as he and Kirkland had discussed barbecuing on Father's Day. He claims the State did not establish that it was his vehicle that entered the alley leading to Bernicky's van, noting there was a length of eight blocks between pod cameras on 79th Street where he could have turned. He asserts that the surveillance footage in Defense Exhibit Nos. 17 and 18 fails to show a Grand Marquis. He argues that, in the footage taken by the camera in the alley, the vehicle does not have the rust spots that are visible in other photos of Franklin's vehicle. Thus, he posits that the other Grand Marquis, visible in the clip of Lamb in the intersection of Ingleside and 79th Street, may have been the one that entered the alley. He further theorizes Warrior could have started the fire, noting that Bernicky owed Warrior money for the van, just as Bernicky owed Franklin money for the lifts.

¶ 68    These arguments amount to nothing more than requests that we reweigh the evidence, which we may not do, and raise hypotheses of innocence that need not be raised to the level of

reasonable doubt. See *Sauls*, 2022 IL 127732, ¶ 52; *Cline*, 2022 IL 126383, ¶ 34.

¶ 69     Moreover, at 5:49 a.m., Franklin's cell phone connected to the same cell phone tower as the one that was connected to in the 5:54 a.m. 911 call, refuting his assertion that he left the area after leaving the gas station. Defense Exhibit No. 17 shows, around the same time as the footage in the composite video, a vehicle that looks substantially similar to the Grand Marquis in the composite video following a black sedan that looks substantially similar to the one the Grand Marquis follows in the composite video. Defense Exhibit No. 18 is not included in the record on appeal and the stipulations indicate that it did not record the relevant time period. The footage from the alley is insufficiently clear to say that the vehicle lacks the rust spots that are visible in other photos of Franklin's vehicle. The Grand Marquis from the 79th Street video where Lamb makes a throat-slashing gesture had a hood ornament, which Franklin's vehicle and the vehicle in the alley lacked. The court was not required to believe that Franklin had purchased the lighter, lighter fluid, and toilet paper for a Father's Day barbecue, where Kirkland testified that they had merely discussed barbecuing and Franklin drove straight from the gas station to the scene of a fire. See *Sauls*, 2022 IL 127732, ¶ 52 (it is the factfinder's responsibility to weigh evidence and draw reasonable inferences from facts).

¶ 70     In sum, when viewed in the light most favorable to the State, the evidence demonstrates that Franklin, slighted by Bernicky, went to look for him in the early morning of June 15, 2019. He purchased a lighter, lighter fluid, and toilet paper from a gas station near Bernicky's location and then drove directly to Bernicky's location. Bernicky's van was discovered engulfed in flames a few minutes later. This evidence sufficed to establish both the *corpus delicti* of the offense and that Franklin was the offender.

¶ 71                                    B. Sentencing

¶ 72    Franklin next challenges his sentence. Arson is a Class 2 felony with a sentencing range of three to seven years' imprisonment. 720 ILCS 5/20-1(c) (West 2018); 730 ILCS 5/5-4.5-35(a) (West 2018). However, the parties agreed that Franklin was eligible for an extended-term sentence of 7 to 14 years' imprisonment, as he had been convicted of another Class 2 felony within the 10 years prior. See 730 ILCS 5/5-5-3.2(b)(1) (West 2018) (court may impose an extended-term sentence where a defendant was convicted of another felony of same or greater class within 10 prior years); 730 ILCS 5/5-4.5-35(a) (West 2018) (extended-term sentence for Class 2 felony is 7 to 14 years' imprisonment). The court imposed a maximum, extended-term 14 year-sentence.

¶ 73                            *1. Improper Aggravating Factors*

¶ 74    Franklin claims that the court relied on two inappropriate factors in aggravation: (1) the risk that the fire could spread and harm someone, where the evidence did not establish that possibility or that the fire risked spreading more than any other fire, and (2) the victim impact statement of Bernicky's father, as Franklin was acquitted of Bernicky's murder. Whether a court relied on an improper factor is a question of law we review *de novo*. *People v. Streater*, 2023 IL App (1st) 220640, ¶ 73. We find the court did not err here.

¶ 75    In imposing sentence, the court noted that there was an occupied house "inches" from the fire, and other people kept their vehicles and clothes near the van. The court thus stated that if the fire had spread it could have killed someone, and the court had to consider the seriousness of Franklin's offense. A court may impose a more severe sentence where a defendant's conduct caused or threatened serious harm. 730 ILCS 5/5-5-3.2(a)(1) (West 2018). Even where causing or threatening serious harm is inherent in the offense, the court may still consider the degree of the harm caused or threatened, as well as the seriousness, nature, and circumstances of the offense.

See *People v. Dowding*, 388 Ill. App. 3d 936, 942-43 (2009) (court may consider degree of harm caused even where serious bodily harm is implicit in offense).

¶ 76    No element of arson explicitly involves causing or threatening serious harm. See 720 ILCS 5/20-1(a) (West 2018) (defining arson). However, to the extent that the threat of serious harm is implicit in every arson, the court could consider the degree of harm threatened by Franklin's arson and the seriousness, nature, and circumstances of his offense. *Dowding*, 388 Ill. App. 3d at 942-43.

¶ 77    Franklin argues that there was no evidence that the fire risked spreading from the van and, therefore, his arson threatened no more harm than any other arson and the court could not consider that factor in aggravation. We disagree. The photograph of the van on fire shows that the van was only several feet from the occupied house. Williams testified that the flames were strong enough that he and West declined to exit the back of the house. A vehicle next to the van sustained heat damage. The strength of the fire and proximity to other objects and an occupied house increased the threat of harm. The court properly considered that in its evaluation of the seriousness of the offense. *Id.*

¶ 78    Nor do we find that the court improperly considered the victim impact statement from Bernicky's father. The Illinois Constitution and the Rights of Crime Victims and Witnesses Act (Act) allow for the victims of violent crimes, the immediate relatives of a deceased victim, and others impacted by a violent crime to be heard at sentencing. Ill. Const. Art. I, § 8.1(a)(5); 725 ILCS 120/3(a) (West 2020); 725 ILCS 120/6(a) (West 2022). Franklin argues that Bernicky's father was not a victim of or impacted by the crime of which he was convicted. However, the constitution provides that "Nothing in this Section or any law enacted under this Section shall be construed as creating" a ground for granting a defendant any relief. Ill. Const. 1970, art. I, § 8.1(e).

Likewise, the Act provides that "Nothing in this Act shall create *** a ground for relief." 725 ILCS 120/9 (West 2022).

¶ 79    Notwithstanding, Franklin argues that the admission of the statement rendered his sentencing hearing fundamentally unfair and deprived him of due process. See *People v. Raney*, 2014 IL App (4th) 130551, ¶¶ 45-46 (error in consideration of victim impact statement warrants reversal for violating due process if error was so unduly prejudicial that hearing was fundamentally unfair). We disagree with his contention. Franklin has not shown that the court considered the statement in imposing sentence. To the contrary, the court stated that it wanted to "be crystal clear" that it was not punishing Franklin for Bernicky's death but was merely considering the offense of which he was convicted.

¶ 80                                              *2. Excessive Sentence*

¶ 81    Last, Franklin argues that the court failed to adequately weigh the mitigating factors in imposing sentence. He argues that he had an "exemplary work history and strong support from family and community members." After his most recent incarceration, he built his own business and hired others who struggled for employment. Several people wrote letters noting Franklin's qualities and standing in the community. He was married with young children. He had left a gang. His prior convictions were not violent. He asserts that the court was required to consider in mitigation that his incarceration would negatively impact his ability to support his children, that his offense did not cause or threaten harm to anyone, and that his offense was provoked by Bernicky taking the money from the lifts. See 730 ILCS 5/5-5-3.1(a)(1), (3), (18) (West 2022) (providing factors to consider in mitigation).

¶ 82    In imposing sentence, a court must balance "the seriousness of the offense" and "the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. The court

must consider all factors in aggravation and mitigation. *People v. Hearring*, 2022 IL App (1st) 192064, ¶ 44. However, the seriousness of the offense is the most important factor (*People v. Towns*, 2020 IL App (1st) 171145, ¶ 48) and may be weighed more heavily than a defendant's rehabilitative potential (*People v. Knox*, 2014 IL App (1st) 120349, ¶ 46). Criminal history alone may also warrant a sentence far above the minimum. *People v. Williams*, 2019 IL App (1st) 173131, ¶ 29. The existence of mitigating factors does not preclude a maximum sentence. *Towns*, 2020 IL App (1st) 171145, ¶ 48.

¶ 83     In reviewing a sentence, we grant great deference to the trial court, as it is best positioned to consider factors such as "the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." (Internal quotation marks omitted.) *People v. Alexander*, 239 Ill. 2d 205, 212-13 (2010). Thus, we will not reverse a sentence absent an abuse of discretion and will not substitute our judgment for the trial court's merely because we may have weighed the factors differently. *Knox*, 2014 IL App (1st) 120349, ¶ 46. A sentence within the statutory limits is presumed proper and will only be disturbed where a defendant affirmatively demonstrates that the sentence varies from the purpose and spirit of the law or is manifestly disproportionate to the nature of the offense. *Id.* Absent an affirmative indication to the contrary, we presume the circuit court considered all mitigating evidence before it. *People v. Kindle*, 2021 IL App (1st) 190484, ¶ 67.

¶ 84     Franklin has failed to demonstrate that his within-range sentence varies from the purpose and spirit of the law or is manifestly disproportionate to the nature of his offense. The court noted that it had heard the evidence and considered in mitigation that Franklin employed people who had difficulty finding work. We disagree that Bernicky's taking approximately $2000 from Franklin was sufficient provocation for Franklin's burning of his vehicle such that it constitutes a mitigating

factor. The record does not indicate the court failed to consider the other mitigating factors Franklin raises. *Id.*

¶ 85    Further, the existence of mitigating factors did not prohibit a maximum sentence. *Towns*, 2020 IL App (1st) 171145, ¶ 48. The court emphasized the premeditated and "vengeful" aspect of Franklin's offense and its seriousness, and the seriousness of an offense is "the most important factor." *Id.* Although his prior convictions were not violent, he had been convicted of several prior felonies. *Williams*, 2019 IL App (1st) 173131, ¶ 29 (criminal history alone may warrant a sentence substantially above the minimum).

¶ 86    Ultimately, Franklin's argument is a request that we reweigh the evidence, which is insufficient to disturb a sentence. *Knox*, 2014 IL App (1st) 120349, ¶ 46.

¶ 87                          III. CONCLUSION

¶ 88    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 89    Affirmed.